UNITED STATES of America, Plaintiff-Appellee,

v.

Orange Jell BEECHUM, Defendant-Appellant.

No. 76–1444.

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1978.

J. Waddy Bullion (Court-appointed), G. Luke Ashley, Dallas, Tex., for defendant-appellant.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., Mervyn Hamburg, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, SIMPSON, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.*

TJOFLAT, Circuit Judge:

This case comes before the court en banc for reconsideration of this circuit's doctrine on the admissibility of offenses extrinsic to a defendant's indictment to prove his criminal intent.[1] That doctrine,

---

* Judge Thornberry did not participate in the consideration of this case.

1. We shall use the term "extrinsic offense" to denote an "offense," see *infra* this note, for which the defendant is not charged in the indictment that is the subject of the case sub judice. Commentators and cases have referred to such offenses as "prior" or "similar" offenses. We choose to avoid the connotations

deriving in part from the case of *United States v. Broadway*, 477 F.2d 991 (5th Cir. 1973), requires that the essential physical elements of the extrinsic offense include those of the offense charged and that each of these elements be proved by plain, clear, and convincing evidence. We are here called upon to determine the effect of the recently enacted Federal Rules of Evidence on this doctrine, an issue expressly reserved in a number of our cases decided prior to the panel opinion in this case.[2] The panel hearing this case was of the opinion, Judge Gee dissenting, that *Broadway* and its progeny survived intact the enactment of the rules. *United States v. Beechum*, 555 F.2d 487, 504–08 (5th Cir. 1977). With deference to the panel, we must disagree. .

A jury convicted Orange Jell Beechum, a substitute letter carrier for the United States Postal Service, of unlawfully possessing an 1890 silver dollar that he knew to be stolen from the mails, in violation of 18 U.S.C. § 1708 (1976). To establish that Beechum intentionally and unlawfully possessed the silver dollar, the Government introduced into evidence two Sears, Roe-

buck & Co. credit cards found in Beechum's wallet when he was arrested. Neither card was issued to Beechum, and neither was signed. The Government also introduced evidence indicating that the cards had been mailed some ten months prior to Beechum's arrest to two different addresses on routes he had serviced. The propriety of the admission of this evidence is the primary issue in this appeal. Before we reach this issue, however, we must round out the facts and note several additional issues.

## I. Facts

Orange Jell Beechum had been a substitute letter carrier in South Dallas, Texas for approximately two and one-half years prior to his arrest on September 16, 1975. Because Beechum had been suspected of rifling the mail on several occasions, postal inspectors planted in a mailbox on Beechum's route a letter containing the silver dollar, a greeting card, and sixteen dollars in currency. According to the testimony of one of the inspectors, the currency had been dusted with a powder visible only under

carried by these more commonly used terms for the following reasons.

The principles governing extrinsic offense evidence are the same whether that offense occurs before or after the offense charged. *See United States v. Pollard*, 509 F.2d 601 (5th Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975). The term "prior offense" is therefore unnecessarily restrictive and misleading.

"Similar offense" is a phrase that assumes the conclusion that extrinsic offenses are admissible only if similar to the offense charged. Although in a technical sense this is true, the common connotations of the word are misleading. The meaning and significance of similarity depends on the issue to which the extrinsic offense evidence is addressed. Stone, *The Rule of Exclusion of Similar Fact Evidence: England*, 46 Harv.L.Rev. 954, 955 (1933); *see* note 15 *infra*. Therefore, to avoid an ambiguous application of the term, we shall speak of similarity only when its meaning is clear in the context.

We use the term "offense" to include "other crimes, wrongs, or acts," as set forth in Fed.R. Evid. 404(b). See Part III. C. *infra*. Our analysis applies whenever the extrinsic activity reflects adversely on the character of the defendant, regardless whether that activity might give rise to criminal liability.

2. *United States v. Brunson*, 549 F.2d 348, 360 n. 17 (5th Cir.), *cert. denied*, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977); *United States v. Brown*, 548 F.2d 1194, 1206 (5th Cir. 1977); *United States v. Maestas*, 546 F.2d 1177, 1180–81 (5th Cir. 1977). Several cases decided since oral argument at the rehearing en banc have also reserved the issue. *United States v. Wilson*, 578 F.2d 67, 73 n. 3 (5th Cir. 1978); *United States v. Evans*, 572 F.2d 455, 484 n. 38 (5th Cir. 1978); *United States v. Bradford*, 571 F.2d 1351, 1353 n. 1 (5th Cir. 1978).

Although language in the panel opinion in *United States v. Bloom*, 538 F.2d 704, 708 (5th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 814, 50 L.Ed.2d 792 (1977), seems to indicate that *Broadway* and the cases following it are consistent with the Federal Rules of Evidence, that language is clearly dictum. *Bloom* held the extrinsic offense evidence admissible under the strict *Broadway* test. A fortiori, that evidence satisfies the less stringent requirements of the Federal Rules. See Part III. C. *infra*. Therefore, the court was not presented with a case, such as the one at hand, in which *Broadway* would exclude evidence that the rules would allow. .

ultraviolet light. A postal inspector observed Beechum retrieving the mail from the mailbox in which the letter had been planted and noted that Beechum stopped at a record shop for approximately one hour before returning to the South Dallas Postal Station. At the station, Beechum turned in the raw mail containing the test letter, and it was discovered that the letter had been opened and resealed. The silver dollar and the currency were missing.

Approximately thirty minutes after having arrived at the station, Beechum was apprehended as he walked toward his automobile, whose engine was running. The arresting inspector informed Beechum that a letter had been planted in the mailbox Beechum had emptied earlier and that the letter had been opened and its contents were missing. Before any questioning, the inspector read Beechum the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Beechum indicated that he understood his rights. The inspector then asked Beechum to empty his pockets. Standing with his front pockets everted, Beechum professed to have relinquished all, but a frisk revealed the silver dollar in his hip pocket. At this time, the inspector discovered in Beechum's wallet the two Sears credit cards, which, as we have noted, were not issued to Beechum and had not been signed.

The arresting inspector questioned Beechum about the credit cards, and Beechum responded first that the only credit cards he possessed were his own. Later, when confronted with the Sears cards, he stated that he had never used them. The inspector testified that in response to further questioning concerning the cards, Beechum said, "Since you have all the answers, you tell me." Record, vol. 2, at 31, 201. The inspector inquired no further.

The Government indicted Beechum on one count for unlawfully possessing the silver dollar. Argument at the preliminary hearing indicated that the primary issue in the case would be whether Beechum har-

bored the requisite intent to possess the silver dollar unlawfully. Defense counsel, by motion in limine heard in the absence of the jury, sought to exclude the credit cards as irrelevant and prejudicial. The court overruled the motion, in part on the basis that the cards were relevant to the issue of intent.[3] *Id.* at 36–37.

In its case in chief, the Government introduced the credit cards and explained the circumstances surrounding their obtention. By stipulation, the Government introduced Sears documents indicating that the two cards had been issued to the parties named on those cards. It was also stipulated that the regular business practice of Sears was to mail such cards within ten days after their issuance. The Government also elicited testimony that the addresses to which the credit cards had been mailed were on routes that Beechum had serviced during the ten month period between the date the cards were issued and the date of Beechum's arrest.

In anticipation that Beechum would claim that he sought to turn in the silver dollar, the Government called to the stand Beechum's supervisor, Mr. Cox. Cox testified that he was in the view of Beechum on several occasions, and, indeed, that he had taken mail directly from Beechum. *Id.* at 101–09.

At the close of the Government's case in chief, the defense moved for a directed verdict of acquittal, alleging that the Government had failed to come forward with sufficient evidence "to establish that Mr. Bonner [*sic*] possessed the silver dollar with a requisite specific intent that the government is required to establish in this case." *Id.* at 138. The defense argued that the Government had failed to demonstrate that the credit cards were unlawfully taken from the mail or that Beechum possessed the cards without authorization. The motion was overruled.

At this time defense counsel indicated to the court that Beechum would take the

---

3. The court also ruled that the cards were admissible as part of the res gestae of the crime for which Beechum was indicted. Record, vol. 2, at 36. See note 15 *infra*.

stand and would testify "as to matters concerning the offense for which he is charged," but that he would invoke the fifth amendment as to any questions concerning the credit cards. *Id.* at 140–41. The defense sought a ruling that the Government be precluded from asking Beechum any question about the cards; the rationale was that the defendant should not be required to invoke his fifth amendment privilege in the presence of the jury. The court declined so to limit the prosecution and indicated that Beechum would have to invoke the amendment in response to the questions he did not wish to answer.

On direct examination Beechum testified that the silver dollar fell out of the mailbox as he was raking out the mail and that he picked it up and placed it first in his shirt pocket, and later (after it had fallen out) in his hip pocket, where he claimed to keep his change. Beechum also testified that, upon return to the postal station, he intended to turn in the silver dollar to Cox but that he could not find Cox.[4] Beechum also stated that he was not leaving the station when he was arrested.[5] No mention was made of the credit cards.

On cross-examination the Government asked Beechum if the credit cards were in his wallet when he was arrested. Defense counsel objected on the basis that inquiry about the cards was outside the scope of cross-examination, and the court overruled the objection. On reassertion of the question, Beechum invoked his fifth amendment rights, but the prosecutor continued questioning on the subject of the cards. This occasioned repeated invocation of the fifth amendment by Beechum and vehement objection by defense counsel. Eventually, Beechum did admit to stating shortly after his arrest that the inspector could "answer his own questions" when the inspector quizzed him about the cards and that the only credit cards he had were his own. *Id.* at 201.

## II. *Issues*

As we have noted, the central issue in this case is whether the district court properly allowed the credit cards to be admitted as extrinsic offense evidence going to the issue of Beechum's intent to possess the silver dollar unlawfully. We hold that the credit cards were properly admissible. The case, however, presents several additional and substantial issues that we must address.

First, the defense contends that the Government was improperly allowed to question Beechum concerning the credit cards because the issue of the cards was without the scope of cross-examination. Since Beechum took the stand to establish the innocence of his intent by testifying that he intended to turn in the coin and since Beechum's possession of the cards was relevant to the issue of his intent, we hold that the Government's questions were within the scope of proper cross-examination.

Second, the defense asserts that the court below impermissibly allowed the Government repeatedly to question Beechum concerning the cards, knowing that he would invoke the fifth amendment in response. That Beechum was forced repeatedly to assert the amendment, the defense claims, created undue prejudice before the jury. We find this contention meritless. When Beechum took the stand to establish that his intent was blameless, he waived his fifth amendment privilege with respect to cross-examination relevant to that issue. Therefore the district court incorrectly allowed Beechum to rely on the fifth amendment and to refuse to answer the Government's inquiries. The defense can hardly argue undue prejudice when the Government was entitled to responses that undoubtedly would have been more damaging than the assertion of the fifth amendment.

We think it profitable to address first the contention that the Government's inquiries

---

4. Two postal employees, friends of Beechum, testified that Beechum had asked if they had seen Cox.

5. Whether Beechum intended to leave was a much contested issue. Beechum claimed to have been waiting for a friend whom he was to drive to a service station.

concerning the cards were outside the scope of cross-examination. A discussion of the propriety of the prosecutor's repeated evocation of Beechum's claim of fifth amendment privilege will follow naturally. Our discourse on these issues will provide a valuable prologue to our disposition of the extrinsic offense problem; many of the policies undergirding the implication of fifth amendment waiver as to matters within the scope of proper cross-examination when the defendant takes the stand are present when he testifies to assert the lack of criminal intent. We conclude that the credit cards were highly probative of Beechum's intent and therefore properly admissible to attack the plausibility of his exculpatory testimony.

Before we move to the analysis of these issues, we must briefly address an issue noted, but not passed upon, by the panel. On direct examination, the Government elicited from the arresting inspector testimony indicating that Beechum gave no explanation for his possession of the silver dollar at the time of his arrest. In closing argument, the prosecutor made the following remarks concerning Beechum's conduct after his arrest. "Mr. Beechum gave no explanation for his possession of the silver dollar. In fact, he told [the inspector], 'You have all the answers, and I don't have any for you.'" 1st Supp. Record at 5.

The issue, apparently raised for the first time by the panel, is whether the witness's testimony and the prosecutor's remark constituted impermissible comments on Beechum's right to remain silent. *See United States v. Warren*, 578 F.2d 1058, 1064, 1072–74 (5th Cir. 1978) (en banc). Had Beechum in fact remained silent at the time of his arrest, we might entertain doubts as to the propriety of the testimony and comment. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see also Chapman v. United States*, 547 F.2d 1240, 1247–50 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). Beechum, however, chose to speak. After the inspector had informed him about the test letter and after Beechum had been read his rights, he chose to reply to the inspector's initial inquiry with the remark that the only credit cards he possessed were his own. When confronted with the Sears cards found in his wallet, he explained that they had never been used. His final response to the questioning was that the inspector could answer any other questions himself because he had all the answers. In context, the latter two of these remarks are tantamount to admissions of guilt. Beechum knew that he was the subject of an investigation for rifling the mails because the inspectors had told him that they had planted a test letter. He was caught red-handed with the coin and the credit cards. All that he could say was, "You have all the answers."

The prosecutor's statement, therefore, is not a comment on Beechum's silence but rather an appraisal of what Beechum said. In effect, the prosecutor was saying, "Beechum did not explain his possession of the silver dollar. In fact, he admitted that he had no explanation for it, because they already had all the answers." Under these circumstances, neither the witness's testimony nor the prosecutor's remarks were improper. *United States v. Mireles*, 570 F.2d 1287, 1291–93 (5th Cir. 1978); *United States v. Berdick*, 555 F.2d 1329 (5th Cir. 1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978).

## III. *Analysis*

### A. *Scope of Cross-examination*

Beechum took the stand at trial to explain his possession of the silver dollar. He claimed that he came upon it innocently when he collected the mail from the box in which the test letter was placed. He testified that he placed the coin in his hip pocket, with the rest of his change, after it fell out of his shirt pocket. Beechum explained that he searched for his supervisor, Cox, so that he could properly relinquish the coin but that Cox was nowhere to be found. Clearly, Beechum was saying that he did not intend to possess the coin unlawfully because he obtained it innocently and intended to give it to the proper authority.

At the time of his arrest, however, Beechum was carrying in his wallet the credit cards of two other persons. If Beechum wrongfully possessed these cards, the plausibility of his story about the coin is appreciably diminished. Therefore, assuming that it could be established that the cards were wrongfully possessed by Beechum, they were relevant to the issue of Beechum's intent to commit the crime for which he was charged. Fed.R.Evid. 401[6]; see Part III. C. *infra.*

■ The scope of proper cross-examination is set forth in Fed.R.Evid. 611(b), which provides as follows:

> *Scope of cross-examination.* Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Implicit in the rule is that all evidence relevant to the subject matter of direct examination is within the scope of cross-examination. *See* McCormick, *Evidence* § 30, at 57–58 (2d ed. 1972). Of course, this is not to say that all such relevant evidence is admissible, for the rules themselves embody policies that exclude evidence even though relevant. *E. g.,* Fed.R.Evid. 403, 404(b). Unless, however, one of these exclusionary policies acts to prohibit the introduction of the credit cards, they are admissible as within the scope of cross-examination because they are relevant to the issue of intent,[7] an issue placed squarely in contention by Beechum's testimony. *See United States v. Pena,* 542 F.2d 292, 294–95 (5th Cir. 1976); *United States v. Gray,* 507 F.2d 1013, 1018–19 (5th Cir.), *cert. denied,* 423

U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). Moreover, that Beechum did not refer to the cards on direct examination does not render inquiry about them irrelevant and therefore does not preclude the Government's inquiries about them.

## B. *Repeated Invocation of the Fifth Amendment*

■ At the close of the Government's case in chief, defense counsel sought a ruling that the prosecutor be prohibited from questioning Beechum about the credit cards because Beechum intended to assert the fifth amendment as to any such questions. The court denied the motion, but Beechum took the stand to profess his innocence despite the court's ruling. As promised, when the prosecutor asked Beechum about the cards, he invoked the fifth amendment. The prosecutor continued to question Beechum concerning the cards, and Beechum continued to assert the privilege. The defense claims this to have created undue prejudice before the jury. We cannot agree.

■ It is an inveterate principle that a defendant who takes the stand waives his fifth amendment privilege against self-incrimination at least to the extent of cross-examination relevant to issues raised by his testimony. *E. g., Brown v. United States,* 356 U.S. 148, 155–56, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958); *Powers v. United States,* 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448 (1912); *United States v. Pate,* 357 F.2d 911, 915 (7th Cir. 1966). Whether a defendant waives the privilege to the full scope of cross-examination permissible under the Federal Rules is an issue we need not determine.[8] As we shall show, however, the

---

**6.** The rule provides as follows: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**7.** Fed.R.Evid. 402 makes all relevant evidence presumptively admissible. It reads as follows: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these

rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."

**8.** The rule delimiting cross-examination, Fed.R. Evid. 611(b), "does not purport to determine the extent to which an accused who elects to testify thereby waives his privilege against self-incrimination." Advisory Committee Notes to Rule 611, 28 U.S.C.A. Rules of Evidence at 317 (1975). The rule gives the trial judge wide

cross-examination in this case comes well within the scope of matters that a defendant is deemed to waive when he takes the stand. The rationale behind this waiver rule is of equal pertinence to the extrinsic offense issue in this case; therefore, we briefly explicate that rationale below.

 Truth is the essential objective of our adversary system of justice. Of course, the search for truth is in certain instances subordinated to higher values. Indeed, the privilege against self-incrimination ordinarily represents such a value.[9] But where the defendant takes the stand to offer his version of the facts, "the interests of the [Government] and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958). To allow a defendant to testify with impunity on matters he chooses and in a manner he chooses is a "positive invitation to mutilate the truth a party offers to tell." *Id.; accord, Fitzpatrick v. United States*, 178 U.S. 304, 316, 20 S.Ct. 944, 948–49, 44 L.Ed. 1078 (1900). The defendant therefore is deemed to waive the privilege, at least with respect to matters about which he testifies, and the Government is entitled to subject his testimony to the acid test of adverse cross-examination.

latitude in allowing cross-examination on issues collateral to the subject matter of direct examination. It states, in pertinent part, "The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

Since the issue of the credit cards in this case is of relevance to the subject matter of Beechum's direct testimony, the Government's cross-examination is clearly within the well-established scope of waiver. We therefore need not address the issue whether cross-examination purely collateral to the subject matter of direct examination is without the scope of the defendant's waiver. *Compare Carlson, Cross-examination of the Accused*, 52 Cornell L.Q. 705 (1967) (questioning constitutional validity of wide-open cross-examination) *and* Note, *Privilege of Criminal Defendant and Scope of Cross-examination*, 5 U.Chi.L.Rev. 116 (1937) (same) *with* 8 Wigmore, *Evidence* § 2276

Here, Beechum sought to attain precisely what the waiver rule seeks to prohibit. His objective was to testify that he intended to give the silver dollar to his supervisor without having to explain the possession of two credit cards not belonging to him. In this, he was largely successful. Had the Government been allowed to ask Beechum about the credit cards, he would have had to explain why he would turn in the coin but keep the cards. Any answer would have borne directly on the issue of intent, and the jury was entitled to consider such highly probative testimony.

The questions the Government sought to ask Beechum concerned matters within the letter and the spirit of the waiver rule. The court below erroneously permitted Beechum to invoke the fifth amendment and avoid response. Not satisfied with this, Beechum contends that he was unduly prejudiced by having to assert the amendment repeatedly. He claims that the prejudice was aggravated because the Government knew that the questions would evoke the assertion of the privilege. We find these contentions without merit.

 It is impermissibly prejudicial for the Government to attempt to influence the jury by calling a witness it knows will invoke the fifth amendment. *United States v. Ritz*, 548 F.2d 510 (5th Cir. 1977); *United States v. Maloney*, 262 F.2d 535 (2d Cir.

(McNaughton rev. 1961) (arguing that defendant waives privilege with respect to all relevant issues except mere credibility).

9. As the Supreme Court has recently stated:

[P]rivileges . . . are designed to protect weighty and legitimate competing interests. Thus, the Fifth Amendment to the Constitution provides that no man "shall be compelled in any criminal case to be a witness against himself." . . . [This] and other interests are recognized in law by privileges against forced disclosure, established in the Constitution, by statute, or at common law. Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth. *United States v. Nixon*, 418 U.S. 683, 709–10, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (footnote omitted).

1959). Moreover, where the government witness indicates beforehand that he will invoke the privilege, the court may properly refuse to allow 'him to testify before the jury. *United States v. Lacouture,* 495 F.2d 1237 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974). But this is not such a case. Here the *defendant* took the stand, knowing full well that the Government would inquire about the cards because the court had refused to prohibit that inquiry.[10] Any prejudice deriving from the invocation of the privilege is therefore attributable to Beechum's decision to testify. Indeed, Beechum can hardly complain; if the court had ruled correctly and not allowed him to invoke the fifth amendment, he could have refused to respond only on peril of contempt. *See United States v. Brannon,* 546 F.2d 1242, 1247 (5th Cir. 1977). Moreover, in that instance the Government would have been entitled to comment on Beechum's refusal to answer, *see Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), notwithstanding the prohibition on such comment where the privilege is properly invoked, *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Beechum achieved essentially what he desired, refusal to testify concerning the cards, without subjection to contempt or comment. He surely cannot successfully claim undue prejudice on this basis.[11]

### C. The Extrinsic Offense

■ At the time of his arrest, Beechum possessed a silver dollar and two credit cards, none of which belonged to him. The only contested issue concerning the silver dollar was whether Beechum intended to turn it in, as he claimed, or to keep it for himself. Apparently, he had possessed the credit cards for some time, perhaps ten months, prior to his arrest. The obvious question is why would Beechum give up the silver dollar if he kept the credit cards. In this case, the Government was entitled to an answer.

■ It is derogative of the search for truth to allow a defendant to tell his story of innocence without facing him with evidence impeaching that story. A basic premise of our adversary system of justice is that the truth is best attained by requiring a witness to explain contrary evidence if he can. As we have seen, for this reason the defendant who chooses to testify waives his fifth amendment privilege with respect to relevant cross-examination. This is not to say that merely by taking the stand a defendant opens himself to the introduction of evidence that is relevant solely to his propensity to commit bad acts or crimes. But where the defendant testifies to controvert an element of the Government's case, such as intent, to which the extrinsic offense is highly relevant, the integrity of the judicial process commands that the defendant be faced with that offense.

In this case, the jury was entitled to assess the credibility of Beechum's explanation but was deprived of the most effective vehicle for determining the veracity of Beechum's story when the judge erroneously allowed Beechum to invoke the fifth amendment and avoid the critical question

---

**10.** The rule prohibiting the Government from calling a witness it knows will assert the fifth amendment applies equally to the defense when it calls witnesses other than the defendant. For example, it is improper for one defendant to call a codefendant for the purpose of having that codefendant take the fifth. *United States v. Johnson,* 488 F.2d 1206 (1st Cir. 1973); *United States v. Beye,* 445 F.2d 1037 (9th Cir. 1971). Neither may the defense call a government informant for the purpose of causing him to invoke the privilege. *United States v. Martin,* 526 F.2d 485 (10th Cir. 1975). Obviously, this principle, which prohibits the defendant from benefiting from any inferences

the jury may make with respect to the culpability or integrity of others because they claim the privilege, is totally inapposite to the defendant himself.

**11.** Our conclusion is in accord with the recent holding of the Ninth Circuit in *United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). There the court held that because the noted defendant, Patty Hearst, took the stand, she waived her fifth amendment privilege and that it was therefore not improper for the Government to ask questions eliciting 42 assertions of the fifth amendment.

on cross-examination. The Government was relegated to the inferences the jury might draw from the credit cards themselves and the additional evidence relating to them. The panel held that the cards and this evidence were insufficient to satisfy the strict standards for admissibility of extrinsic offense evidence established by *United States v. Broadway*, 477 F.2d 991 (5th Cir. 1973). We agree that *Broadway* dictates that the credit cards should not have been admitted; because this is so, we must reject the *Broadway* standards.

■ *Broadway* established two prerequisites to the admissibility of extrinsic offense evidence. First, it required that the physical elements of the extrinsic offense include the essential physical elements of the offense for which the defendant was indicted. Second, the case mandated that each of the physical elements of the extrinsic offense be established by plain, clear, and convincing evidence.[12] The elements of the offense for which Beechum was convicted, violation of 18 U.S.C. § 1708 (1976), include the following: (1) that the defendant possessed the item, (2) that the item was stolen from the mail, (3) that the defendant knew that the item was stolen, and (4) that the defendant specifically intended to possess the item unlawfully. *See United States v. Ellison*, 494 F.2d 43 (5th Cir. 1974); *United States v. Kimbrell*, 487 F.2d 219 (5th Cir. 1973); *United States v. Martinez*, 466 F.2d 679 (5th Cir. 1972), *cert. denied*, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). The first three elements were not disputed, except to the extent that a denial of the fourth renders the item not stolen for the purposes of the second and third elements. The physical elements of the crime are the first two. The panel held that the Government's proof as to the credit cards failed to establish the second element, that the cards were stolen from the mail, by the plain, clear, and convincing evidence required by the second prong of the *Broadway* test. For the purposes of the following analysis, we accept this conclusion as valid.

■ We must overrule *Broadway* because a straightforward application of the Federal Rules of Evidence calls for admission of the cards. The directly applicable rule is Fed.R.Evid. 404(b), which provides as follows:

> *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule follows the venerable principle that evidence of extrinsic offenses should not be admitted solely to demonstrate the defendant's bad character. Even though such evidence is relevant, because a man of bad character is more likely to commit a crime than one not, the principle prohibits such evidence because it is inherently prejudicial. *See, e. g., Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948). Without an issue other than mere character to which the extrinsic offenses are relevant, the probative value of those offenses is deemed insufficient in all cases to outweigh the inherent prejudice. Where, however, the extrinsic offense evidence is relevant to an issue such as intent, it may well be that the evidence has probative force that is not substantially outweighed by its inherent prejudice. If this is so, the evidence may be admissible.[13]

---

12. This standard of proof was termed "plain, clear, and *conclusive*" in the *Broadway* opinion. 477 F.2d at 995 (emphasis supplied). Later cases substituted "convincing" for "conclusive." *E. g. United States v. San Martin*, 505 F.2d 918, 921 (5th Cir. 1974).

13. We think it significant that Congress acted to amend rule 404(b) to place greater emphasis on admissibility of extrinsic offense evidence

than had the Supreme Court's version. The House Committee Report states,

> The second sentence of Rule 404(b) as submitted to the Congress began with the words "This subdivision does not exclude the evidence when offered". The Committee amended this language to read "It may, however, be admissible", the words used in the 1971 Advisory Committee draft, on the

What the rule calls for is essentially a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403.[14] *See Rule 404(b) Other Crimes Evidence: The Need for a Two-Step Analysis*, 71 Nw.U.L.Rev. 636 (1976). The test for relevancy under the first step is identical to the one we have already encountered. The standards are established by rule 401, which deems evidence relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Where the evidence sought to be introduced is an extrinsic offense, its relevance is a function of its similarity to the offense charged. In this regard, however, similarity means more than that the extrinsic and charged offense have a common characteristic. For the purposes of determining relevancy, "a fact is similar to another only when the common characteristic is the significant one for the purpose of the inquiry at hand." Stone, *The Rule of Exclusion of Similar Fact Evidence: England*, 46 Harv.L.Rev. 954, 955 (1933). Therefore, similarity, and hence relevancy, is determined by the inquiry or issue to which the extrinsic offense is addressed.

Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense.[15] *See Weiss v. United States*, 122

---

ground that this formulation properly placed greater emphasis on admissibility than did the final Court version.

H.R.Rep. No. 93–650, 93rd Cong., 1st Sess. 7, *reprinted in* [1974] U.S.Code Cong. & Admin. News 1974, pp. 7075, 7081. The Department of Justice had recommended this amendment to bring the rule in line with rule 402, which establishes the presumption that relevant evidence is admissible. *Proposed Rules of Evidence: Hearings on H.R. 5463 Before the Special Subcomm. on Criminal Justice of the House Comm. on the Judiciary*, 93rd Cong., 1st Sess. 344 (1973).

The legislative history indicates that Congress intended the admissibility of extrinsic offense evidence to be determined by the same standards as any other evidence, once the preliminary determination that the extrinsic offense is relevant to an issue other than the defendant's character has been made. Indeed, the Senate Committee Report evidences an intent carefully to delimit the trial judge's discretion to exclude extrinsic offense evidence. It states as follows:

> [T]he use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i. e. prejudice, confusion or waste of time.

S.Rep. No. 93–1277, 93rd Cong., 2d Sess. 24–25, *reprinted in* [1974] U.S.Code Cong. & Admin.News 1974, pp. 7051, 7071.

**14.** The Advisory Committee Notes to rule 404(b) indicate that this is the analysis contemplated by the rule:

> No mechanical solution [to the issue of admissibility of extrinsic offense evidence] is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403.

28 U.S.C.A. Rules of Evidence at 109 (1975).

The Advisory Committee Note's directive is reinforced by the Senate Committee Report, which states, "with respect to permissible uses for [extrinsic offense] evidence, *the trial judge may exclude it only on the basis of those considerations set forth in Rule 403*, i. e. prejudice, confusion or waste of time." S.Rep. No. 93–1277, 93rd Cong., 2d Sess. 24–25 (emphasis added), *reprinted in* [1974] U.S.Code Cong. & Admin.News 1974, pp. 7051, 7071. See note 13 *supra*.

**15.** It is crucial to distinguish the use of extrinsic offense evidence to prove issues other than intent. In other contexts different standards apply because the inference to be drawn from the extrinsic offense is not based upon the reasoning applicable here. To illustrate this proposition and to place our discussion in the proper context, we digress briefly and examine

F.2d 675, 683 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941); 2 Wigmore, *Evidence* § 302 (3d ed. 1940). Under *Broadway*, that the defendant had unlawful intent in the commission of the extrinsic offense is established by requiring the Government to prove each physical element of that offense by plain, clear, and convincing evidence. And the extrinsic offense is deemed admissible only if its physical elements include those of the offense charged. We think that *Broadway* runs afoul of the Federal Rules of Evidence by imposing on the Government too strict a standard of proof and by requiring too close an identity of elements.

■ Obviously, the line of reasoning that deems an extrinsic offense relevant to the issue of intent is valid only if an offense was in fact committed and the defendant in fact committed it. Therefore, as a predicate to a determination that the extrinsic

---

the use of extrinsic offense evidence in other settings.

Evidence of extrinsic offenses may be admissible to show motive, which has been defined as "the reason that nudges the will and prods the mind to indulge the criminal intent." Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L.Rev. 325, 328 (1956) (footnote omitted). For example, the prosecution may establish impecuniousness as a motive for robbery by showing that the defendant had been threatened for nonpayment of a debt incurred in a drug transaction. *United States v. Johnson*, 525 F.2d 999, 1006 (2d Cir. 1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976). The only point of similarity between the charged and extrinsic offenses in this instance is that the same individual committed both. Therefore, overall similarity is not required when the offense is introduced to show motive.

Such evidence is admissible to indicate knowledge. Thus, the Government may prove that the defendant knew that he was passing counterfeit securities by eliciting testimony that the defendant knowingly had purchased counterfeit currency on a prior occasion. *Peters v. United States*, 376 F.2d 839 (5th Cir. 1967). Again, similarity of the physical elements of the crime need not be established. The extrinsic offense need merely be of such a nature that its commission involved the same knowledge required for the offense charged.

The identity of the defendant may be established by evidence of offenses extrinsic to the indictment. In this instance, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi. *United States v. Goodwin*, 492 F.2d 1141, 1154 (5th Cir. 1974). Thus, "[a] much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind." *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977). As an example, a prior conviction for possession of heroin may not in itself establish that in an unrelated prosecution a defendant possessed heroin with intent to distribute. If, however, that conviction and the charged offense involved white heroin, an extremely rare type in the region, a distinctiveness may be established that is sufficient to allow admission of the prior offense to show identity. *United States v. Baldarrama*, 566 F.2d 560 (5th Cir. 1978).

Extrinsic offenses may be admitted if part of a common plan, scheme, or design. Although this category encompasses a variety of circumstances, *see* 2 Weinstein & Berger, *Weinstein's Evidence* ¶ 404[09] (1976), we shall address only one. If the uncharged offense is "so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other, the general rule of exclusion does not apply." Slough & Knightly, *supra*, at 331. Evidence admitted under this test is termed part of the res gestae of the crime charged. *E. g., United States v. McDaniel*, 574 F.2d 1224, 1227 (5th Cir. 1978). Physical similarity is not a requisite here. Illustrative is the case of *United States v. Hughes*, 441 F.2d 12 (5th Cir.), *cert. denied*, 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971). This was an appeal from convictions for printing counterfeit obligations, possessing counterfeit plates and negatives, and possessing counterfeit federal reserve notes. We held that it was not prejudicial error for the trial court to have admitted several sawed-off shotguns found at the premises of the operation. "The record of entry and use of [the premises] for their counterfeiting operation would be grossly incomplete without the account of their guns, intimidations, beatings, and violence. . . . [T]he guns in question were pertinent evidence because they were so closely blended and inextricably bound up with the history of the crime itself as to constitute a part of the plan or system of criminal action involved in this case." *Id.* at 20.

We have taken this opportunity to digress to point out that the meaning and nature of the "similarity" requirement in extrinsic offense doctrine are not fixed quantities. Each case must be decided in its own context, with the issue to which the offense is directed firmly in mind.

offense is relevant, the Government must offer proof demonstrating that the defendant committed the offense. If the proof is insufficient, the judge must exclude the evidence because it is irrelevant. The issue we must decide is by what standard the trial court is to determine whether the Government has come forward with sufficient proof.

The standard of proof for ruling upon factual conditions to relevancy is supplied by Fed.R.Evid. 104(b), which states as follows:

> *Relevancy conditioned on fact.* When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

As the rule provides, the task for the trial judge is to determine whether there is sufficient evidence for the jury to find that the defendant in fact committed the extrinsic offense. *See* Morgan, *Functions of Judge and Jury in the Determination of Preliminary Questions of Fact,* 43 Harv.L.Rev. 165 (1927). The judge need not be convinced beyond a reasonable doubt that the defendant committed the extrinsic offense, nor need he require the Government to come forward with clear and convincing proof.[16] The standard for the admissibility of extrinsic offense evidence is that of rule 104(b): "the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist." 21 Wright & Graham, *Federal Practice and Procedure: Evidence* § 5054, at 269 (1977).

Once it is determined that the extrinsic offense requires the same intent as the charged offense and that the jury could find that the defendant committed the extrinsic offense, the evidence satisfies the first step under rule 404(b). The extrinsic offense is relevant (assuming the jury finds the defendant to have committed it) to an issue other than propensity because it lessens the likelihood that the defendant committed the charged offense with innocent intent. See text accompanying note 15 *supra.* It is not necessary that the physical elements of the charged and extrinsic offenses concur for this inference to be drawn and relevancy established. If the elements do match, the extrinsic offense may have greater probative value, but this is not an issue of relevancy. Evidence is relevant once it appears "to alter the probabilities of a consequential fact." Weinstein & Berger, *Weinstein's Evidence* ¶ 401[06], at 401–18 (1976). The probative value of the evidence is a matter to be weighed against its potential for undue prejudice, and the similarity of the physical elements of the charged and extrinsic offenses figures in at this stage. Therefore, we turn to the second step of the analysis required by rule 404(b), whether the evidence satisfies rule 403.

As we have stated, the central concern of rule 403 is whether the probative value of the evidence sought to be introduced is "substantially outweighed by the danger of unfair prejudice." *Broadway* would reverse this standard by requiring a high degree of similarity between the extrinsic and charged offenses and a stringent standard of proof. In effect, the case attempts to establish a threshold requirement that the evidence possess great probative value before it can be admitted. This requirement not only contravenes rule 403 but also fails to meet its own declared ends. De-

---

**16.** It is not true that every fact or issue in a criminal case need be proved beyond a reasonable doubt. Indeed, the admissibility of highly prejudicial, and perhaps even dispositive, evidence is governed by lesser standards. For instance, findings at suppression hearings are made by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974); *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Of course, each of the essential elements of the offense for which the defendant is being tried must be proved beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 361–63, 90 S.Ct. 1068, 1071–72, 25 L.Ed.2d 368 (1970). *Winship,* however, "was not concerned with standards for determining the admissibility of evidence or with the prosecution's burden of proof at a suppression hearing when evidence is challenged on constitutional grounds." *Lego v. Twomey,* 404 U.S. at 486, 92 S.Ct. at 625.

manding that the Government prove by excessive evidence each physical element of the extrinsic offense does not necessarily enhance its probative value and may in fact increase its unfair prejudice. One of the dangers inherent in the admission of extrinsic offense evidence is that the jury may convict the defendant not for the offense charged but for the extrinsic offense.[17] *See* Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters*, 70 Yale L.Rev. 763, 773 (1961). This danger is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged. Moreover, "[e]ven if the jury is no more disposed to punish the accused for his unpunished past crimes, 'over-persuasion' may lead them to conclude that, having committed a crime of the type charged, he is likely to repeat it." *Id.* It is for fear that the jury would draw just this inference that extrinsic offense evidence is excluded when it is relevant solely to the issue of the defendant's character. The touchstone of the trial judge's analysis in this context should be whether the Government has proved the extrinsic offense sufficiently to allow the jury to determine that the defendant possessed the same state of mind at the time he committed the extrinsic offense as he allegedly possessed when he committed the charged offense. Forcing the Government to "overpersuade" the jury that the defendant committed an offense of substantial similarity engenders excessive and unnecessary prejudice.

The task for the court in its ascertainment of probative value and unfair prejudice under rule 403 calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense. As the Advisory Committee Notes to rule 404(b) state: "No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403." 28 U.S.C.A. Rules of Evidence at 109 (1975).

Probity in this context is not an absolute; its value must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference.[18] It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice. Dolan, *Rule 403: The Prejudice Rule in Evidence*, 49 S.Cal.L.Rev. 220, 234–35 & n. 52 (1976); *see United States v. Baldarrama*, 566 F.2d 560, 568 (5th Cir. 1978). Thus, if the Government has a strong case on the intent issue, the extrinsic offense may add little and consequently will be excluded more readily. *See, e. g., United States v. Lawrance*, 480 F.2d 688, 691–92 n. 6 (5th Cir. 1973). If the defendant's intent is not contested, then the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice; therefore, in this circumstance the evidence is uniformly excluded.[19]

17. The reader should recall that we use the term "offense" to include noncriminal activity that impugns the defendant's character. See note 1 *supra*. The danger of a jury's reprisal for unpunished extrinsic activity is likely to be less when that activity is not of a criminal nature but merely "bad." The trial judge should recognize, however, that the conscience of a jury does not always coincide with the perimeters of criminality.

18. Cases and commentators have discussed this notion of probative value in reference to the "necessity" for the extrinsic crime evidence. *E. g., United States v. Baldarrama*, 566 F.2d 560, 568 (5th Cir. 1978); Note, *Other Crimes Evidence at Trial: Of Balancing and*

*Other Matters*, 70 Yale L.J. 763, 771 (1961). As the Note cited above indicates, "in determining probative worth, the court should evaluate the prosecution's other admitted and admissible evidence to determine whether the offered other crimes evidence is necessary to prove the issue beyond a reasonable doubt." *Id.* at 772 (footnote omitted).

19. Although it would seem that the extrinsic offense would be irrelevant if the issue of intent were not contested, the rules apparently deem evidence that has probative force with regard to an uncontested issue to be relevant.

The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence

*E. g., United States v. Kirk,* 528 F.2d 1057, 1060–61 (5th Cir. 1976); *United States v. Goodwin,* 492 F.2d 1141, 1151 (5th Cir. 1974). In measuring the probative value of the evidence, the judge should consider the overall similarity of the extrinsic and charged offenses. If they are dissimilar except for the common element of intent, the extrinsic offense may have little probative value to counterbalance the inherent prejudice of this type of evidence. Of course, equivalence of the elements of the charged and extrinsic offenses is not required. But the probative value of the extrinsic offense correlates positively with its likeness to the offense charged.[20] Whether the extrinsic offense is sufficiently similar in its physical elements so that its probative value is not substantially outweighed by its undue prejudice is a matter within the sound discretion of the trial judge. The judge should also consider how much time separates the extrinsic and charged offenses: temporal remoteness depreciates the probity of the extrinsic offense. *E. g., United States v. Carter,* 516 F.2d 431, 434–35 (5th Cir. 1975).

■ As this case demonstrates, a significant consideration in determining the probative value of extrinsic offense evidence is the posture of the case. If at the commencement of trial it is not certain that the defendant will contest the issue of intent, the judge is in a poor position to weigh the probative value against the prejudice of the evidence because he cannot foresee the nature or extent of either the Government's case or the defendant's response. Whether a mere plea of not guilty justifies the Government in introducing extrinsic offense evidence in its case in chief is an open question in this circuit. *United States v. Adderly,* 529 F.2d 1178, 1181–82 (5th Cir. 1976); *United States v. Urdiales,* 523 F.2d 1245, 1247 (5th Cir. 1975), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976); *cf. United States v. Ring,* 513 F.2d 1001 (6th Cir. 1975) (holding extrinsic offense evidence inadmissible in case in chief where innocent intent not pleaded). We need not now answer it. Although the credit cards in this case were introduced by the Government in its case in chief, it was clear before the case went to trial that the crucial issue would be Beechum's intent. In effect all the other elements of the crime for which Beechum was indicted were conceded. See text following note 12 *supra.* Where it is evident that intent will be an issue at trial, we have held the admission of the extrinsic offense as part of the Government's case in chief not to be grounds for reversal. *United States v. Adderly,* 529 F.2d at 1182. In any event, Beechum waived any objection he might have had to the Government's order of proof when he

offered to prove a point conceded by the opponent, the ruling should be made on the basis of such considerations as waste of time and undue prejudice (see Rule 403), rather than under any general requirement that evidence is admissible only if directed to matters in dispute. Advisory Committee Notes to Rule 401, 28 U.S.C.A. Rules of Evidence at 85 (1975). Where, however, intent is not an element of the crime charged, extrinsic offense evidence directed to that issue would be irrelevant and therefore subject to exclusion under rule 402. *United States v. Lawrance,* 480 F.2d 688, 690 (5th Cir. 1973).

20. It is true as well that the more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant. The likelihood that the jury will convict the defendant because he is the kind of person who commits this particular type of crime or because he was not punished for the extrinsic offense increases with the increasing likeness of the offenses. Of course, it is also true that this prejudice is likely to be less when the extrinsic activity is not of a criminal nature. See notes 1 & 17 *supra.*

In any event, the judge must consider the danger of undue prejudice of this type when he determines whether to admit the extrinsic offense evidence. The judge should be mindful that the test under rule 403 is whether the probative value of the evidence is *substantially* outweighed by its unfair prejudice. As one commentator has put it, "the discretionary policy against undue prejudice would seem to require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." Trautman, *Logical or Legal Relevancy—A Conflict in Theory,* 5 Vand.L. Rev. 385, 410 (1952).

took the stand and professed the innocence of his intent.

We shall now apply the precepts we have set forth to the facts of this case. As we have demonstrated above, the credit card evidence is relevant to Beechum's intent with respect to the silver dollar. That Beechum possessed the credit cards with illicit intent diminishes the likelihood that at the same moment he intended to turn in the silver dollar. If there is sufficient evidence to establish that Beechum wrongfully possessed the credit cards, the requirement of the first step under rule 404(b), that the evidence be relevant to an issue other than propensity, is met. This is so even if the evidence were insufficient for a finding that the cards were stolen from the mail. As we have said, relevancy is established once the identity of the significant state of mind is established. The similarity of the physical elements of the extrinsic and charged offenses is a measure of probity.

The standard for determining whether the evidence is sufficient for a finding that Beechum wrongfully possessed the credit cards is provided by rule 104(b): whether the evidence would support such a finding by the jury. We think the evidence in the record clearly supports a finding that Beechum possessed the credit cards with the intent not to relinquish them to their rightful owners. Beechum possessed the credit cards of two different individuals. Neither card had been signed by the person to whom it was issued. When asked about the cards, Beechum answered first that the only cards he had were his own. When confronted with the credit cards, which were obviously not his own, Beechum responded that they had never been used. He refused to respond further because the inspector "had all the answers." The logical

inference from this statement is that Beechum was attempting to mitigate his culpability, having been caught red-handed. The undisputed evidence indicated that he could have possessed the cards for some ten months. The jury would have been wholly justified in finding that Beechum possessed these cards with the intent permanently to deprive the owners of them. This is all the rules require the court to determine to establish the relevancy of the extrinsic offense evidence.

■ We move now to the second step of the rule 404(b) analysis, the application of rule 403. The incremental probity of the extrinsic offense evidence in this case approaches its intrinsic value. Indeed, the posture of this case and the nature of the Government's proof with respect to the intent issue present perhaps the most compelling circumstance for the admission of extrinsic offense evidence. From the very inception of trial, it was clear that the crucial issue in the case would be Beechum's intent in possessing the silver dollar. He took the stand to proclaim that he intended to surrender the coin to his supervisor. The issue of intent was therefore clearly drawn, and the policies of justice that require a defendant to explain evidence that impugns his exculpatory testimony were in full force.[21] As we have seen, these policies dictate that a defendant waive his fifth amendment privilege against self-incrimination as to cross-examination relevant to his testimony. Where a privilege so central to our notions of fairness and justice yields to the search for truth, we should not lightly obstruct that quest. The credit card evidence bore directly on the plausibility of Beechum's story; justice called for its admission.[22]

21. Where the intent issue is so clearly delineated, evidence relevant to that issue is not lightly excluded. See United States v. Dudley, 562 F.2d 965 (5th Cir. 1977) (prior conviction properly admissible where defendant claimed he borrowed and did not steal automobile); McCormick, Evidence § 190, at 452 (2d ed. 1972).

22. A consideration peculiar to the unique setting of this case weakens considerably Bee-

chum's objection to the admission of the credit card evidence. The court below improperly allowed Beechum to invoke the fifth amendment in response to the Government's cross-examination concerning the credit cards. Had the Government been allowed to elicit the responses to which it was entitled, it is highly likely that the Government would have established from Beechum's own mouth facts sufficient to satisfy even the Broadway standards.

That the posture of this case demanded the admission of the credit card evidence is reinforced by the nature of the Government's proof on the issue of intent apart from that evidence. This proof consisted of the following. The Government called Cox, Beechum's supervisor, who testified that Beechum had had several opportunities to surrender the coin to him. Beechum denied this, and called two fellow employees who testified that Beechum had asked them if they had seen Cox. Absent the credit card evidence, the issue would have been decided wholly by the jury's assessment of the credibility of these witnesses. The Government, therefore, did not make out such a strong case of criminal intent that the credit card evidence would have been of little incremental probity. In fact, the credit card evidence may have been determinative.

The overall similarity of the extrinsic and charged offenses in this case generates sufficient probity to meet the rule 403 test that the probative value of the evidence not be substantially outweighed by its unfair prejudice. We think this to be true even if it could not be established that the credit cards were stolen from the mail. At the least, there was sufficient evidence for the jury to find that Beechum possessed property belonging to others, with the specific intent to deprive the owners of their rightful possession permanently. That Beechum entertained such intent with respect to the credit cards renders less believable the story that he intended to turn in the coin in this instance. The force of this inference is not appreciably diminished by the failure of the Government to prove that the cards actually were stolen from the mail.

The probity of the credit card evidence in this case is augmented by the lack of temporal remoteness. Although Beechum may have obtained the cards as much as ten months prior to his arrest for the possession

of the silver dollar, he kept the cards in his wallet where they would constantly remind him of the wrongfulness of their possession. In effect, Beechum's state of mind with respect to the credit cards continued through his arrest. He maintained contemporaneously the wrongful intent with respect to the cards and the intent as regards the coin. The force of the probity of this circumstance is illustrated by what Beechum would have had to convince the jury in order to avoid it. He would have been forced to argue that his state of mind was schizoid—that he intended at the same time to relinquish the coin but to keep the cards. This situation does not differ significantly from one in which a thief is caught with a bag of loot, is charged with the larceny as to one of the items, but claims that he intended to return that item. Would any reasonable jury believe this story when it is established that he had stolen the rest of the loot?

The remaining considerations under rule 403 do not alter our conclusion as to the admissibility of the extrinsic offense evidence in this case. The extrinsic offense here is not of a heinous nature; it would hardly incite the jury to irrational decision by its force on human emotion. The credit card evidence was no more likely to confuse the issues, mislead the jury, cause undue delay, or waste time than any other type of extrinsic offense evidence. Since the need for the evidence in this case was great, it can hardly be said that the admission of the cards constituted "needless presentation of cumulative evidence."

It is significant that the court was careful to allay, as much as limiting instructions can, the undue prejudice engendered by the credit card evidence. It gave extensive instructions to the jury on the limited use of extrinsic offense evidence employed to prove unlawful intent.[23]

The court's error cut short this line of proof, to Beechum's undeserved benefit. We think the argument that the credit cards should not have been admitted for failure of sufficient proof that Beechum took them from the mails somewhat disingenuous under these circumstances.

23. The Advisory Committee Notes to rule 403 require the judge to consider the effectiveness of a limiting instruction in reducing the prejudicial impact of evidence. "In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness

Having examined at length the circumstances of this case, we conclude that the credit card evidence meets the requirements of rule 403. Therefore, the conditions imposed by the second step of the analysis under rule 404(b) have been met, and the extrinsic offense evidence in this case was properly admitted at trial.

## IV. *Conclusion.*

For the reasons stated above, we AFFIRM Beechum's conviction. The opinion

of a limiting instruction." 28 U.S.C.A. Rules of Evidence at 102–03 (1977). *See also* Fed.R. Evid. 105.

This is a context in which limiting instructions are of substantial efficacy, *United States v. Evans*, 572 F.2d 455, 484–85 (5th Cir. 1978), and we think the judge adequately admonished the jury to consider the credit card evidence solely on the issue of Beechum's intent. We reproduce below the instructions he gave.

> During the course of this trial certain evidence has been presented concerning an alleged transaction similar to that charged in the indictment, to wit, the possession by the Defendant of the two Sears credit cards, admitted in evidence as Government Exhibits 6 and 7.

> This evidence, if you choose to accept it, is admitted for the limited purpose of assisting you in determining the intent with which a defendant may have acted. In this regard, you are instructed that evidence of an alleged similar transaction may not be considered by the jury in determining whether an accused committed the acts or participated in the activity alleged in the indictment.

> Nor may evidence of such an alleged similar transaction of a like nature be considered for any other purpose whatever unless the jury first finds that the other evidence in the case, standing alone, establishes beyond a reasonable doubt that the accused participated in the activity alleged in the indictment.

> If the jury should find beyond a reasonable doubt from other evidence in the case that the accused participated in the activity alleged in the indictment, then the jury may consider evidence as to transactions of a like nature, in determining the state of mind or intent with which the accused did the act charged in the indictment.

> I want to instruct you very explicitly and unequivocally as to the very limited extent to which you may consider this evidence as to a similar offense.

> As I just instructed you, you may consider such evidence of another transaction of a like nature in determining the state of mind or

of the panel in this case, reported at 555 F.2d 487, is hereby VACATED.

AFFIRMED.

GOLDBERG, Circuit Judge, with whom GODBOLD, SIMPSON, MORGAN and RONEY, Circuit Judges, join, dissenting:

As the lights are being extinguished on Broadway, I feel impelled to light a few candles in requiem.

The majority has gone well out of its way[1] to overrule *Broadway*. In the panel

> intent with which the accused may have done the act charged in the indictment, but only if you first find that the other evidence standing alone establishes beyond a reasonable doubt that the defendant committed the act alleged in the indictment.
>
> Record, vol. 1, at 23–24.

1. There are numerous reasons why an overruling of *United States v. Broadway*, 477 F.2d 991 (5th Cir. 1973) was unnecessary and inappropriate in this case. In some ways, the court's overruling of *Broadway* might even be viewed as a form of dictum.

The most obvious reason is that the majority seems to view the facts of this case in such a way that the *Broadway* test is actually satisfied. In order to overrule *Broadway* it mistakenly defines the *Broadway* test as stricter than it really is. The majority is of the opinion that the "physical elements" part of the *Broadway* test would require that both offenses involve thefts *from the mails*. But of course the panel opinion left this an open question under *Broadway*. 555 F.2d 487, 499–500.

The panel opinion said the credit card evidence flunked the *Broadway* test because there was an insufficient showing that the cards were stolen or wrongfully possessed at all, not whether they were stolen from the mails. Id. at 499. The panel majority felt the evidence showed neither unlawful nor illicit possession of the cards, just "unexplained possession." Id. It is not illegal or illicit to possess credit cards loaned to one by friends, or even perhaps to carry and not use cards found in the street. In any case, the physical elements and intents of these acts are quite different from the elements and intent of keeping a coin one knows is stolen from the mails. The majority does not dispute this. Instead the majority asserts that it is convinced the evidence *did* prove wrongful possession. At one point it states, "we think the evidence in the record *clearly* supports a finding that Beechum possessed the credit cards with the intent not to relinquish them to their rightful owners." (emphasis added.) p. 916 *see also* p. 917. If so, then the majority should change the result under *Broadway*, not

opinion, 555 F.2d 487 (5th Cir. 1977), the panel majority explained why the policies and doctrines of *Broadway* are sound. I affirm those views here. But I must add a few comments because the opinion of the en banc majority leaves the law in this area in such a confused state. In this dissent I make two broad arguments. First I show how the majority misinterpreted Rule 404(b) of the Federal Rules of Evidence. Basically the majority's reading of the rule fails because it reads so broadly the second sentence in Rule 404(b), which makes certain evidence admissible, that it allows the second sentence to swallow up the first sentence of Rule 404(b), which explicitly bars the admissibility of certain evidence. In addition, this too broad reading of Rule 404(b)'s second sentence conflicts with explicit language in other related federal evidence rules, such as Rules 609 and 608. Finally I note that no other circuit or legal commentator has seen in Rule 404(b) the same destructive and revolutionary intent that the majority apparently sees. On the contrary, *many circuits calmly preserved doctrines similar to Broadway in the wake of Rule 404(b)'s passage, often even terming the rule a codification of their law.* My second broad argument concerns the test with which the majority replaces *Broadway*. I argue that not only is this test little

more than a subjective, difficult to apply version of *Broadway*, but that it is even *more* hostile to extrinsic offense evidence than *Broadway* in some respects.

I. *The Majority Misinterprets Rule 404(b).*

A. The Majority's Too Broad Reading of the Second Sentence in Rule 404(b) Allows it to Swallow Up the First Sentence.

Rule 404(b) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) seems to me to identify two conflicting policies and to require the courts to reconcile them. One policy is that extrinsic acts evidence is sometimes probative of material facts. For that reason, the second sentence authorized us to reason from unrelated past acts and states of mind to current states of mind. But at the same time the drafters of the rule were wary of

---

the underlying law itself. To reach the extreme position of overruling *Broadway* in this case, instead of just disputing the result of its application to the facts in this particular case, as Judge Gee did in his panel dissent, 555 F.2d at 510, the majority had to define *Broadway's* test too strictly and to break down doors left open by the panel.

In addition, the majority replaced the "clear and convincing" proof part of the *Broadway* test with a loose Rule 104 test. But then the majority goes on to state that in this particular case the evidence "clearly" supports incriminating findings. (Id. at p. 916.)

Second, the majority itself writes of the "peculiar" and "unique" aspects of the case insofar as it is colored by the 5th amendment waiver and scope of cross-examination issues. (*See, e. g.,* p. 916 n. 21) It is easy to see how such collateral issues could preempt the *Broadway* test. For example, consider a case where a defendant took the stand and testified that he knew he intended to return the silver dollar because he recently found two Sears credit cards and returned those immedi-

ately. Clearly this might open the door to evidence of the cards that *Broadway otherwise* would keep out. But in such a case *Broadway* would be pre-empted, not overruled. And yet the majority repeatedly states that *Broadway* must be overruled here because justice demands that the defendant's testimony be rebutted. *See, e. g.,* p. 909 ("But where the defendant testifies to controvert an element of the Government's case, such as intent, to which the extrinsic offense is highly relevant, the integrity of the judicial process commands that the defendant be faced with that offense.") The problem with this sort of logic is that in the next case when the defendant does not so testify, *Broadway* is no longer pre-empted by a conflicting policy, but it is also no longer law, because it was overruled in an earlier "peculiar" and "unique" case. We suggest to the majority that *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), restricted *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it did not presume to overrule it.

such reasoning. Thus they wrote the first sentence. Its purpose is to caution us that extrinsic acts evidence is fraught with dangers of prejudice—extraordinary dangers not presented by other types of evidence.[2] Had the drafters not thought the dangers were extraordinary, they would never have given us the first sentence; they would have written only the second sentence and the general balancing test of Rule 403. *Broadway* and similar doctrines were designed precisely to deal with such extraordinary dangers.

The majority reads this rule differently. It thinks that so long as the probative value of extrinsic acts evidence is not "substantially outweighed" by its prejudicial effect, Rule 403, the evidence is to be admitted. (Majority opinion, p. 911.) How does the majority dispose of the first sentence, then? Here is where, to my mind, it seriously misapprehends the rule. The majority reads the rule to establish two watertight compartments: extrinsic acts evidence which relates "solely to . . . the defendant's character", ante at 914; *see also* ante at 910, 911, 913, 914 in n. 19, and that which is relevant for other purposes, including state of mind. Thus the majority thinks the rule unequivocally allows us to reason that because a defendant displayed an improper intent in the past, he is more likely to have had an evil intent in the act for which he is tried. *See* p. 913. How this differs from reasoning that the defendant has a "propensity" to act with evil intent, *id.* is beyond reason; but the majority says the rule prohibits references based on propensity. There simply are no such watertight compartments to be found, unless we engage in subtle and sophisticated metaphysical analysis.[3]

Even the majority implies at one point that extrinsic offense evidence submitted allegedly to show intent is really just bad character evidence in sheep's clothing. The majority writes:

> "Our analysis applies whenever the extrinsic activity reflects adversely on the *character* of the defendant, regardless whether that activity might give rise to criminal liability." (emphasis added.) Majority opinion p. 903 n. 1.

And in footnote 17 the majority adds: "The reader should recall that we use the term 'offense' to include noncriminal activity that impugns the defendant's *character.*" (emphasis added.) Majority opinion p. 914 n. 17. These comments don't nibble at the first sentence in Rule 404(b)—they consume it altogether.

Moreover, the majority's "watertight compartment" view of Rule 404(b) leads to a conclusion that the first sentence of Rule 404(b) is superfluous. Simply, evidence which is probative "solely" of bad character and not of any fact related to the elements of the crime, such as intent, identity, etc., is inadmissible in any event, under Rule 401, because it is irrelevant. As Rule 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

---

2. Evidence of other offenses allegedly committed by the defendant seriously threatens the integrity of a criminal trial.

As we explained in our panel opinion:
First, the jury may punish the defendant for the prior rather than the charged offense. Second, the jury may infer from the defendant's assumed guilt of the prior offense that he committed the charged offense. Third, the jury may infer that two incomplete or unproved offenses somehow cumulate to justify some punishment. This, of course, is the danger of bootstrapping, whereby a prosecutor uses an incomplete prior offense and an incomplete charged offense to reinforce each other, each providing the basis of an infer-

ence that completes the other. 555 F.2d 487, 508.
These risks are even higher in a case such as *Beechum* where the defendant has never faced prosecution for the extrinsic offenses, tempting a jury to think he has escaped his due punishment.

3. Wigmore noted the inextricable interrelation of intent and bad character evidence when he wrote that, in the "anxiety not to infringe upon the character rule, evidence highly appropriate to show knowledge, intent, or design, and amply fulfilling the proper tests for that purpose, has often been excluded." 2 J. Wigmore, Wigmore on Evidence § 305 (3rd ed.).

To be sure, I find it nearly impossible to imagine any "extrinsic offense" which would make a jury think that the defendant had a bad character or a criminal propensity, but which did not also have at least *some* tendency to make it less probable than it would be without the evidence that he had a purely innocent, law-abiding intent in the charged offense. But, more importantly, if such "extrinsic offense" evidence were so purely irrelevant to intent and to the other elements of the charged crime, I can not see how it could pass the Rule 401 relevancy test even to necessitate the application of the Rule 404(b) bar to its admission.

The "watertight compartment" view of Rule 404(b) could lead to other peculiarities as well. Constrained by the explicit words of Rule 404(b), the majority concedes that extrinsic offense evidence which relates "solely" to a defendant's propensity to commit the charged crime is barred by the first sentence of Rule 404(b), no matter how much its probative value outweighs its prejudicial effect.[4] But when a judge thinks the extrinsic offense also relates to the defendant's propensity to intend to commit the charged crime, then the question leaps over to the second watertight compartment, where the presumption is heavily in favor of admitting the evidence, unless its probative value is substantially outweighed by prejudice. The alchemy of the majority opinion would radically change the rule from a total bar of the evidence regardless of the probative-prejudice balance to a balancing test substantially weighted in favor

of admissibility, simply because a judge metaphysically classifies the question as propensity to intend rather than as propensity to commit. Since propensity is largely a concept of a person's psychological bent or frame of mind, it seems extreme to have so much turn on so little, if any, of a distinction. I respectfully refuse to adopt the majority's Dr. Jekyll-Mr. Hyde interpretation of Rule 404(b). It is a horror fantasy that should pass by the boards of Broadway.[5]

**B. The Majority's Reading of Rule 404(b) Conflicts With the Explicit Language in Rules 609 and 608.**

Another problem with the majority's interpretation of the vague language in Rule 404(b) is that it conflicts with the specific language in Rules 608 and 609. Suppose, for example, that Beechum had been convicted of fraudulent use of credit cards 10 years before his trial for the coin theft. Under Rule 609, if Beechum took the stand his credibility could be impeached with evidence of the prior conviction only if the probative value of the prior offense *substantially* outweighed its prejudicial impact on the jury. If the conviction had been more recent than 10 years ago, then the test would be a simple weighing of probativeness and prejudice.

Next, suppose that the evidence of the prior offense were clear and convincing, but that the defendant had never been convicted for it. In this case, Rule 608 would forbid *any* admission of the evidence of the prior offense except for what could be elic-

---

**4.** On page 910 of its opinion the majority "deems" that the probative value of this evidence could never outweigh its prejudicial impact, but deeming is not believing. Of course *some scale-tipping probative evidence is kept out by this sentence*, or else it is made superfluous by Rule 403 and the second sentence in Rule 404(b).

**5.** At worst, of course, the extreme result of the majority position might even be that the first sentence in Rule 404(b) effectively applies only to crimes in which criminal intent is not an element.

Even where intent is not disputed by the defendant, the majority notes at p. 914 n. 18,

extrinsic offense evidence would still be relevant and admissible. Thus, it might be that once intent is an element of the crime—as it is with almost all crimes—then the defendant is left only with the minimal protection afforded by the "substantial prejudice" test in Rule 403. Such a lop-sided reading of Rule 404(b) is sheer illogic. More importantly, it invites a flagrant abuse of the rights of accused citizens.

To escape this unthinkable result, the majority reads into Rule 401 a "same intent" requirement that is little more than a subjective version of *Broadway*, and in some ways is even stricter than *Broadway*. This aspect of the majority opinion is discussed in Part II *infra*.

ited from the defendant on the stand. If the defendant chose to exercise his Fifth Amendment right of silence, then no evidence of the prior offense could reach the jury.

Now, finally, consider the result under the majority's reading of Rule 404(b). Here the evidence of a prior offense is independently admissible to the jury,[6] as long as its probative value is not substantially outweighed by its prejudicial impact. The prior offense need not be proved beyond a reasonable doubt, as in Rule 609, nor even clearly and convincingly, as might be the case under Rule 608, but rather only to the minimal Rule 104 standard, i. e. where a reasonable jury might find the defendant committed the crime. This leads to a bizarre anomaly. According to the majority, the government under Rule 404(b) can submit with ease prejudicial, flimsy evidence of an extrinsic offense, but under Rule 609, where the crime was proved beyond a reasonable doubt, the admissions standards are much stricter. Under Rule 608, the evidence is inadmissible entirely except from the defendant's own mouth, even if the evidence of the other crime is clear and convincing, or established beyond a reasonable doubt.[7] You might say then that, for purposes of admitting extrinsic offense evidence, the majority of this court may at times presume a defendant guilty until he is proven guilty beyond a reasonable doubt, at which point the court may begin presuming him innocent.

### C. The Majority's View of Rule 404(b) Conflicts with the Views of Other Circuits and with Leading Commentators.

The majority is of the opinion that Rule 404(b) demands that *Broadway* be strictly overruled. Majority opinion p. 910. No other circuit or legal commentator has come close to giving the rule such destructive force or intent. The Eighth Circuit has calmly preserved a doctrine similar to *Broadway*, citing for authority pre-Rule 404(b) cases, post-Rule 404(b) cases, and the rule itself.[8]

The Ninth Circuit, terming the rule a codification of prior case law,[9] continues to apply the same test as the Eighth Circuit, including the "clear and convincing" proof requirement.[10]

The Seventh Circuit has continued its use of the same three-part test used by the Eighth and Ninth Circuits, including the "clear and convincing" evidence requirement, calling the test "well established."[11]

Other circuits also have maintained tests much stricter than the test the majority here feels is required by Rule 404(b). For example, the Sixth Circuit still requires a

---

**6.** That is, the government can submit it directly to the jury, whether or not the defendant takes the stand, and does not have to elicit it from the defendant on the stand, as in Rule 608.

**7.** The majority might try to explain this by asserting that impeachment evidence of a criminal defendant is generally less probative of guilt than evidence of an element of the crime, such as intent. We find this argument less than convincing. Inferring intent in one crime from the defendant's behavior in a totally unrelated crime seems to us at least as tenuous and unprobative as evidence that a defendant is lying on the stand. The 609/404 distinction is especially flimsy where the defendant is testifying about his intent. Where extremely tenuous evidence is involved, we see little difference between trying to prove that the defendant is lying, and trying to prove that what he is saying is a lie.

Moreover, probativeness is a factor taken into account in the balancing process itself. If impeachment evidence is inherently less probative, then this can be fully reflected by its weight in the balancing test itself without also requiring that the test be weighted specially against the evidence.

**8.** The Eighth Circuit has required that the extrinsic offense be proved by "clear and convincing evidence," that its probative value outweigh its prejudicial effect, and that the extrinsic offense be "similar in kind and reasonably close in time" to the charged crime. *United States v. Bledsoe*, 531 F.2d 888, 891 (8th Cir. 1976).

**9.** *U. S. v. Rocha*, 553 F.2d 615, 616 (9th Cir. 1977).

**10.** *United States v. Brashier*, 548 F.2d 1315, 1325 (9th Cir. 1976).

**11.** *United States v. Feinberg*, 535 F.2d 1004, 1009 (7th Cir. 1976).

"substantial similarity" between the extrinsic and charged offenses as a "prerequisite to qualify for one of the exceptions" in Rule 404(b).[12] The Second Circuit continues to apply its "well-established" threshold test that evidence of the "similar" extrinsic acts must be *substantially* relevant for a purpose other than merely to show defendant's criminal character or disposition."[13] (emphasis added.) Even the Third Circuit, which has one of the least rigid Rule 404(b) tests in the country, sees the rule as codifying its requirement that the probative value must outweigh the prejudice, rather than our majority's "substantially outweighed" by prejudice test.[14] Weinstein's Evidence also concludes the rule has little or no impact on the case law.[15]

Even the Advisory Committee Notes cast doubt on the majority's sense that Rule 404(b) compels us to use the "substantially outweighed" test in Rule 403. The Notes say:

"No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decisions of this kind under Rule 403." 28 U.S.C.A. Rules of Evidence at 109 (1975).

Thus, the Notes seem to advise use of a straight-forward prejudice/probativeness

**12.** *United States v. Ailstock*, 546 F.2d 1285, 1289 (6th Cir. 1976).

**13.** *United States v. Cavallaro*, 553 F.2d 300, 305 (2d Cir. 1977).

**14.** *United States v. Goichman*, 547 F.2d 778, 782 (3rd Cir. 1976).

**15.** 2. J. Weinstein & M. Berger, Weinstein's Evidence, § 404[08] (1976):
"Rule 404(b) lists some of the instances in which other crimes evidence may be admissible . . . . In point of fact the decisions are not appreciably affected by the form of the rule." Id.

**16.** The Notes' reference to Rule 403 is only to the kinds of facts "appropriate" under Rule 403, not to that rule's "substantially outweighed" test. *See* the discussion of this point in our panel decision, 555 F.2d 487, 505–506.

balancing test, not the "substantially outweighed" test of Rule 403.[16]

## II. *The Majority Replaces Broadway with a Worse Test.*

If Rule 404(b) were no more than the intersection of Rules 104, 401 and 403, as the majority at times implies, then the prosecution of any crime in which intent was an element could include evidence of any extrinsic wrong-doing of the defendant which had *any* tendency to prove that it was less probable he acted with law-abiding intent (Rule 401), and which evidence had a prejudicial effect which might outweigh its probativeness, but not substantially (Rule 403).[17] Instead the majority restricts this hopelessly broad floodgate for extrinsic offense evidence by building into Rule 401 a "similarity" test reminiscent of *Broadway*. Strictly speaking, the relevance test in Rule 401 is no more than a requirement that the evidence have some "tendency" to change the probability of a consequential fact, such as criminal intent. But the majority adds to this simple, albeit grossly overbroad threshold test, the requirement that the intent of the extrinsic crime be the "same" as the intent of the charged crime. The majority writes:

Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's in-

**17.** This standard would be as unfair as it is all encompassing, given that criminal defendants invariably tend to live in the real world, which is not inhabited by saints alone. (Even visitors to Broadway must travel a few paces on 42nd Street before reaching the comfort and safety of their loge seats.) The plain fact is that many people think there is a criminal "type" who not only has a bad "character," but everything that goes with it—bad intentions, bad motives, bad plans, etc. This kind of thinking is inimical to the principles of due process and presumed innocence that dignify our criminal system. In this country our government simply may not deprive one of its citizens of his freedom unless it charges that he committed a specific crime and proves beyond a reasonable doubt that he committed that specific crime.

dulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. Majority opinion, p. 911.

And it states:

The touchstone of the trial judge's analysis in this context should be whether the Government has proved the extrinsic offense sufficiently to allow the jury to determine that the defendant possessed the same state of mind at the time he committed the extrinsic offense as he allegedly possessed when he committed the charged offense. Majority opinion, p. 914.

The majority nowhere explains where it gets this additional test.[18] It is no more stated in Rules 401, 403 and 404 than is *Broadway*. Admittedly it does seem to serve the same critical function of preventing the second sentence in Rule 404(b) from swallowing the first. Nevertheless, it is a poor replacement for *Broadway* for two reasons. First, it replaces *Broadway's* objective test of similar physical elements with a subjective, psychological test of determining when a defendant was "indulging . . . in the same state of mind in the perpetration of both the . . . offenses." Second, in some situations it could

be even more hostile to the admission of extrinsic offense evidence than *Broadway* was.

A. The Majority's New Similarity Test is a Subjective Version of *Broadway*.

The majority's "psychological indulgence" test seems to call on a district judge to decide whether the defendant "indulged himself" in the "same state of mind" in the preparation of two crimes. It totally escapes me how one would go about making this decision. If a person snatches a purse, cheats on his income taxes, and then steals a coin from the mail, is he "indulging himself in the same state of mind in the perpetration" of the offenses? Would a court say, for example, that the defendant is "indulging himself in the same state of mind in the perpetration" of these offenses because, at some point in each offense, he intends to possess property rightfully belonging or owed to another? Moreover, is this Freudian and ill-defined type of psycho-analysis required, or even suggested, by Rule 401's definition of relevance?

It was precisely this impossibility of comparing psychological states of mind that led *Broadway* to settle on a simple comparison

18. Similarly, in footnote 15 on page 21 the majority trots out several other venerable old pre-Rule 404(b) tests for the admissibility of extrinsic offense evidence. In support, the opinion cites pre-Rule 404(b) cases and law review articles. For example, the majority cites the "handiwork" test for use of other offense evidence to show identity, the "same knowledge" test where criminal knowledge is to be proved, and the "so linked" test where common plan evidence is involved. My question is this: where does the majority find these tests in the 57 words of Rule 404(b)? Why do these venerable common law tests survive the onslaught of the "revolutionary" Rule 404(b) when *Broadway* does not? If we logically extend the illogical purge begun by the *Beechum* majority against the structured common law standards in the intent area for screening out unfair or improper evidence of extrinsic offenses in a criminal trial, must we not also eviscerate the reasoned, objective tests in the other areas mentioned in Rule 404(b), such as identity and common plan? And if we do extend the analysis of the *Beechum* majority to

the other areas of proof named in Rule 404(b), must not this circuit say that, for example, whenever the government offers extrinsic offense evidence to show a defendant's identity, the district court simply asks whether the evidence is relevant under Rule 401, and then whether its probative value is not substantially outweighed by its prejudicial impact? Certainly the majority would not contend that other offense evidence that just barely fails the old "handiwork" test would be accorded *no* relevance value at all under the evidence-hungry looseness of Rule 401. What if it were shown (unclearly and unconvincingly, of course) that a defendant stole one car by hot wire, and then is accused of stealing a second car with a key? Clearly there is no handiwork involved. But does not evidence of the first theft, under Rule 404(b), affect to some minimal degree the probability that the defendant in the second is the same man? Is the defendant then left with nothing but the hope that the judge finds that the prejudice substantially outweighs the probative value of the evidence?

of only the physical elements of the two crimes.[19] As is demonstrated in the next section, the issue of the *strictness* of a test can be kept entirely separate from whether the test turns on subjective or objective factors. Thus I do not see what the majority accomplishes by telling a district judge to match up psychological indulgences rather than physical elements.[20] The new test seems to add little to the effort except hazy uncertainty. One might even say that the majority did not overrule *Broadway* at all;

**19.** In the panel opinion we wrote:

It is usually as difficult to prove the mental element of the prior offense as it is to prove the mental element of the charged offense, which, of course, the prior offense is introduced to establish in the first place. Consequently, the mental element of the prior offense need not be "clearly" proved but may be inferred by the trier of fact from the totality of the circumstances.

555 F.2d 487, 494. Citing *Broadway*, 477 F.2d 991, 995 n.5.

**20.** Switching the comparisons from the concrete to the fuzzy and subjective did not seem a key concern of the drafters of the Federal Rules of Evidence, either. One might argue, of course, that where intent is the element to be proved, it is more apt to compare mental elements than physical elements, regardless of the proof difficulties inherent in the former. The U.S. Supreme Court has not directly addressed this question. But in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), it was called upon to decide whether the evidence of one fraudulent real estate transaction could be considered evidence of the intent in another allegedly fraudulent real estate transaction. The question came up in a challenge to the seizure of the evidence of the extrinsic offense under a warrant authorizing the seizure only of evidence of the charged fraud involving Lot 13T. To determine whether the seized evidence was sufficiently related to the Lot 13T transaction under investigation to constitute evidence of the intent in the latter, the court painstakingly compared the physical elements of the two transactions, in a manner much like *Broadway*. The Court's analysis follows:

In the present case, when the special investigators secured the search warrants, they had been informed of a number of similar charges against petitioner arising out of Potomac Woods transactions. And, by reading numerous documents and records supplied by the Lot 13T and other complainants, and by interviewing witnesses, they had become familiar with petitioner's method of operation. Accordingly, the relevance of documents pertaining specifically to a lot other than Lot

it simply moved it from Times Square to the Bermuda Triangle.

B. The Majority's "Psychological Indulgence" Test Could be Even Stricter Than *Broadway*.

Needless to say, turning a test of objective facts into a test of subjective facts does not necessarily make it a looser test. In fact, in this case there is a good chance that the majority's "psychological indulgence"

13T, and their admissibility to show the Lot 13T offense, would have been apparent. Lot 13T and the other lot had numerous features in common. Both were in the same section of the Potomac Woods subdivision; both had been owned by the same person; and transactions concerning both had been handled extensively by petitioner. Most important was the fact that there were two deeds of trust in which both lots were listed as collateral. Unreleased liens respecting both lots were evidenced by these deeds of trusts. Petitioner's transactions relating to the other lot, subject to the same liens as Lot 13T, therefore, were highly relevant to the question whether his failure to deliver title to Lot 13T free of all encumbrances was mere inadvertence. Although these records subsequently were used to secure additional charges against petitioner, suppression of this evidence in this case was not required. The fact that the records could be used to show intent to defraud with respect to Lot 13T permitted the seizure and satisfied the requirements of *Warden v. Hayden*, [387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782].

Id. at 2750.

Of course the majority does not contend that a dissimilarity between the physical elements of two offenses is irrelevant to the admissibility question. Rather, the majority instructs the district judge to take dissimilarity into account in the second stage balancing test by giving a lower probative value assessment to evidence of dissimilar crimes. Majority opinion at pp. 913–914. But in its next breath, the court tells us that "the probative value of the extrinsic offense correlates positively with its likeness to the offense charged," *and* that "the more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant." Majority opinion at 915. In other words, the majority seems to think that, as a general rule, as the extrinsic offense becomes more dissimilar, it becomes less probative and less prejudicial *at the same time.* Since the balancing test the court proposes simply weighs the probative value against the prejudicial cost of evidence, dissimilarity all but factors out of the equation.

test could be even more hostile to extrinsic offense evidence than was *Broadway*. The majority deludes itself on this point by defining *Broadway* too harshly. Specifically, the majority seems to think that *Broadway* requires a one-to-one correspondence between all the physical elements of the two offenses. This is wrong.[21] In fact, in this case the panel opinion even left open the question whether both thefts had to involve the mails. For example, it might be possible that *Broadway* would be satisfied by an extrinsic offense involving a theft of credit cards from a neighbor's wallet, as long as the essential physical elements of theft were shared and there was "some basis for an inference of similarity between the mental elements of the extrinsic and charged offenses." 555 F.2d 487, 494. As the panel opinion said,

> "we must not demand perfect identity between the prior and charged offenses or impose mechanical requirements that lose sight of the underlying purpose of the rule. *Broadway's* requirement that the essential physical elements of the charged offense be matched by physical elements of the prior conduct allows a surprising degree of flexibility to this end."

Id. at 496.[22]

But in its "psychological indulgence" test, the majority requires much more than "some basis for an inference of similarity between the mental elements." To be specific, the majority requires that the government must prove "the extrinsic offense sufficiently to allow the jury to determine that the defendant possessed the *same state of mind* at the time he committed the extrinsic offense as he allegedly possessed when he committed the charged offense." Majority opinion p. 914. (emphasis added.)

We might easily imagine a situation in which two crimes involved the same essential physical elements and in which there was "some basis for an inference of similarity between the mental elements" of the two crimes, but in which there was not enough evidence to support a jury determination that the defendant possessed the *same* state of mind in both cases. For example, imagine a defendant who stole two cars, one for a joy ride around the block and one to resell surreptitiously. *Broadway* might allow in evidence of the joy ride, whereas the "psychological indulgence" test might not.

## Conclusion

The concepts in this case are not simplistic. But our task is made especially difficult here by the language we use to solve it. We are all guilty to some extent (mea culpa) of indulging in jurisprudential jargon. But the analysis of the majority too often bogs down by trying to solve problems with a few key words, phrases and clauses, such as "substantially outweighed," "relevance," "probative," "similarity," "prejudicial effect," and the like. To make matters worse, the majority debases these words by trading their established meanings for its own language of semantic subjectivity, such as its "psychological indulgence" test.

At the heart of the majority's error in this case is its mistaken placement of the spotlight on the Federal Rules of Evidence, instead of where it rightfully belongs—on the criminal trial of a human being. The majority places the vague and uninformed stage hands of the drama—the Federal Rules of Evidence—in the center of the stage, and pushes the principles of a fair criminal trial into weak, whispered support-

---

21. *See* discussion at 918 n. 1 *supra.*

22. The key word here is "essential." As the panel opinion stated:

> there must remain in the trial court some discretion to determine the level of generality at which to apply the *Broadway* rule. In other words, given the above hypothetical we would simply say that the fact that one statute specifies "government checks" does not make the latter element *an essential physical element* of the offense for purposes of determining similarity between prior and charged offenses.
>
> We thus abstract from the prior and charged offenses a level of generality at which similarity will retain substantial probative value. (emphasis added.)
> 555 F.2d 487, 497.

ing roles off to the edge of the proscenium wall. This means the death of *Broadway*, the majority admits. But it is also an assault on the legitimacy of our criminal system. The majority has, and is, misdirected. The Federal Rules can be supporting actors, at most. They must be directed one way in a civil trial and another way altogether in a criminal trial where human freedom is at stake. Rule 404(b), and most of the other federal rules as well, were designed to be broadly applicable to both criminal and civil trials. But evidence is allowed into a civil trial under a much more flexible, utilitarian standard than in a criminal trial. Due process requires extreme vigilance against the contamination of a criminal trial with cheap and mean character slander, and against the conviction of a citizen for improper reasons. The majority cannot possibly think that Rule 404(b) overrules this central principle of justice, or that it collapses the criminal trial into the utilitarianism of civil litigation.

*Broadway* may not be stylish, it may not be chic, but its old-fashioned virtues should command our reverence. *Broadway* was one more last bastion of judging a man by the specifics of the charged crime, rather than by a vague, undocumented, unauthenticated record of misbehavior. The protective mantle of presumed innocence is under severe attack in some modern-day jurisprudence, but the majority's Cain marks become almost ineradicable. The majority's opinion goes far in making one slip a noose.

At the heart of this dissent is a concern about the proper level of hostility or hospitality to extrinsic offense evidence. But in this dissent I am even more concerned about the practicality and integrity of the analysis this circuit will employ in making these judgments. In this case the majority has obliterated a venerable, well-reasoned body of law for no good reason at all, and has replaced it with a Freudian, difficult to apply subjective test that, outside this and a few other similar cases, will not even accomplish what the majority wants. It is especially ironic that the majority should justify its evisceration of *Broadway* by declaring that the "revolutionary" drafters of Rule 404(b) wanted the old standards cleared from the stage to make room for the free form, uncontrolled balancing-test discretion of the new Theatre of the Absurd. For no sooner were the objective flats and screens of the legitimate *Broadway* stage pulled aside, than the majority brought in the psychological psychedelics of the Theatre of Indulgence. I can only hope that the majority will soon see the error of its ways and return to the Great White Way of *Broadway* with the appreciation and respect that the grand old boulevard deserves.

I would reverse the judgment of the district court and remand the case for a new trial.