# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 14, 2013

No. 11-50653

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CESAR OBREGON-REYES, also known as Chino; RAFAEL VEGA, also
known as Rafa,

Defendants - Appellants.

Appeals from the United States District Court
for the Western District of Texas
USDC No. 3:10-cr-00599-DB-4

Before STEWART, Chief Judge, GARZA, and ELROD, Circuit Judges.

PER CURIAM:[*]

Appellants Cesar Obregon-Reyes ("Obregon") and Rafael Vega ("Vega")
were convicted by a jury of: (1) kidnapping, and aiding and abetting, in violation
of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2; (2) conspiracy to kidnap, kill or maim
in a foreign country, in violation of 18 U.S.C. § 956(a); (3) conspiracy to use an
interstate commerce facility in commission of murder for hire, in violation of 18
U.S.C. § 1958; and (4) interstate and foreign travel in aid of racketeering, and
aiding and abetting, in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2.  Obregon

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 11-50653

and Vega challenge their convictions and sentences of life imprisonment. We AFFIRM.

I.

The facts of this case involve the kidnapping and murder of a drug runner for the Sinaloa Cartel, an organized and violent Mexican drug-trafficking organization. On September 3, 2009, Sergio Saucedo ("Saucedo") and his wife, Maria Longoria ("Longoria"), left their home to run errands and to pick up their children. When they returned home at approximately 2:45pm, they encountered three men inside who were brandishing guns and wearing black T-shirts, baggy jean shorts, black tennis shoes and baseball caps. At least two of the men were wearing black gloves.

One of the men instructed Longoria to put her children inside her son's room. One of the other men told Saucedo to get down on the floor. As Longoria was taking the children to the room, she tried to dial 911 on her cell phone. One of the men saw her, took the phone and instructed her to go into the living room. He then told her to get on the floor. While she was on the floor, the men used duct tape to tie her hands and feet and put tape over her mouth. They then went over to Saucedo, tied his hands and put tape over his mouth. Longoria heard one of the men make a phone call. During that call, the man said "Neuro, we have them." The men then told Saucedo to stand up, at which time two of the men took him out the back door. The third man went into the room where the children were located, grabbed Longoria's purse and walked out the back door.

Longoria then heard a gunshot and her husband screaming for help. Longoria dragged herself to the window near the door and looked outside. Longoria saw the two men holding Saucedo and he was still screaming. As the third man was about to hit Saucedo in the head with a gun, the man turned in Longoria's direction and appeared to see her at the window, at which time he stopped. Longoria then closed the blinds and proceeded to remove the tape from

2

No. 11-50653

her hands and feet.  When she made it outside, the three men and her husband were gone.  At that time, Longoria saw her neighbor, "Erika," who was already calling 911.  Longoria told Erika to tell them that her husband had been kidnapped.

A sheriff's officer arrived shortly thereafter and the investigation began. During the investigation, Longoria could not identify Obregon or Vega as being involved in the kidnapping.  Multiple witnesses testified to seeing and hearing events from the kidnapping.  Only one witness—Olga Martinez ("Martinez"), a school bus-driver in that neighborhood—was able to identity Obregon as being involved in the kidnapping.  Martinez testified that when she reached a nearby intersection on the date and time of the kidnapping, she saw three men trying to put another man into a maroon Expedition that did not have any license plates.  Martinez heard the man yelling for help, and observed that the man's head was bleeding and his hands were taped.  Martinez identified Obregon as one of the two men who were holding the man as they tried to put him into the vehicle.

Saucedo was subsequently killed and his body was found in Juarez, Mexico, five days after his kidnapping.  Saucedo's hands had been amputated.

By superceding indictment, together with a third co-defendant, Omar Obregon-Ortiz ("Taylor"), Obregon and Vega were charged and found guilty of: (1) kidnapping, and aiding and abetting, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2; (2) conspiracy to kidnap, kill or maim in a foreign country, in violation of 18 U.S.C. § 956(a); (3) conspiracy to use an interstate commerce facility in commission of murder for hire, in violation of 18 U.S.C. § 1958; and (4) interstate and foreign travel in aid of racketeering, and aiding and abetting, in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2.  The district court sentenced both Obregon and Vega to life imprisonment.  Obregon and Vega timely appealed their judgments of conviction and sentences.

3

No. 11-50653

II.

Obregon raises two claims on appeal. First, Obregon contends that the district court's admission of extrinsic evidence of a prior home invasion that he committed to prove identity in the instant case was error. Second, he argues that the district court's jury instruction on similar acts was improper. Vega raises three different claims on appeal. First, Vega challenges the sufficiency of the evidence to support his convictions. Second, he argues that the district court improperly excluded statements that his former attorney made to him as hearsay. Third, Vega claims that the district court's denial of his motion to remove a juror for bias after the commencement of trial was error. We address each of these arguments in turn.

A.

Obregon's first claim on appeal is that it was error for the district court to admit evidence of a prior home invasion that he committed to prove his identity in the home invasion at issue in this case ("the September 3, 2009, home invasion"). The district court overruled Obregon's objection to the admission of this extrinsic evidence under Rule 404(b) of the Federal Rules of Evidence.

"We review the district court's admission of extrinsic evidence over a [Rule] 404(b) objection under a 'heightened' abuse of discretion standard." *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003). Under this heightened standard, "we do not reverse for erroneous admissions under Rule 404(b) if the error was harmless." *United States v. Templeton*, 624 F.3d 215, 221 (5th Cir. 2010). "An error is harmless when it does not affect the substantial rights of a party. The government has the burden of establishing harmlessness beyond a reasonable doubt." *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008).

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular

4

occasion the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose, such as proving [identity]." Fed. R. Evid. 404(b). We analyze Rule 404(b) admissions under the two-step test articulated in *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978). First, we must determine whether "the extrinsic evidence is relevant to an issue other than the defendant's character." *Id.* at 911. Second, we must evaluate whether the evidence possesses "probative value that is not substantially outweighed by its undue prejudice." *Id.* at 911.

The district court did not abuse its discretion in admitting extrinsic evidence of the prior home invasion that Obregon committed. The first step of the *Beechum* analysis is satisfied because extrinsic evidence of the prior home invasion was relevant to prove identity, which Obregon put at issue by disputing his involvement in the September 3, 2009, home invasion. *See Beechum*, 582 F.2d at 912 n.15 ("[T]he identity of the defendant may be established by evidence of offenses extrinsic to the indictment."); Fed. R. Evid. Rule 404(b) (providing that "evidence of a crime, wrong, or other act" may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *United States v. Torres-Flores*, 827 F.2d 1031, 1034 (5th Cir. 1987) (holding that prong one of the *Beechum* test was satisfied when the government offered extrinsic evidence to prove identity, which the defendant contested, because the extrinsic evidence was "relevant to an issue other than propensity").

Turning to step two of the *Beechum* analysis, we make a "commonsense assessment of all the circumstances surrounding the extrinsic offense" to determine whether its probative value is not substantially outweighed by undue prejudice. *Id.* at 914. When making this assessment, we consider several factors, including: (1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, and (3) the amount of

No. 11-50653

time separating the two offenses. *United States v. Sanchez*, 988 F.2d 1384, 1394 (5th Cir. 1993) (citing *Beechum*, 582 F.2d at 915).

The balance of these factors supports the conclusion that the probative value of extrinsic evidence of the prior home invasion was not substantially outweighed by undue prejudice. As to the first factor, the government needed the extrinsic evidence to corroborate Martinez's testimony, which Obregon "fiercely contested" because it identified him at the scene of the September 3, 2009, home invasion. As to the second factor, the facts of the prior home invasion and the September 3, 2009, home invasion were substantially similar. Both home invasions involved entry into the residence through a window, three men who wore wearing black clothing, and the brandishing of a pistol. Both homes were also ransacked in a similar fashion: the bottom dresser drawers were left open; the upper drawers were closed or almost closed; the contents of the drawers were thrown on the floor; air vents were removed; furniture was overturned; and the lining under the furniture was cut or removed. A three-liter bottle of Coke was also found in both homes, and the victims testified that the bottle was not there before the invasion. A plastic glove containing Obregon's DNA was found in the prior home invasion, and Longoria testified that she saw two of the kidnappers wearing gloves. In both home invasions, the adult victims were separated from their children inside of the house before being tied with tape. Both home invasions also involved an adult male victim who was involved in drug trafficking and believed to have lost or stolen a quantity of marijuana. Finally, as to the third factor, the prior home invasion took place only one month prior to the September 3, 2009, home invasion. Therefore, the district court did not abuse its discretion in admitting extrinsic evidence of the prior home invasion.

Obregon's second claim on appeal challenges the district court's jury instruction on similar acts. Because "[d]istrict courts enjoy substantial latitude

6

No. 11-50653

in formulating a jury charge . . . we review all challenges to . . . jury instructions for abuse of discretion. *United States v. Webster*, 162 F.3d 308, 321–22 (5th Cir. 1998). Under this standard, "we consider whether the instruction, taken as a whole, is a correct statement of law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *Ebron*, 683 F.3d at 151.

First, Obregon argues that the jury instruction on similar acts was an improper statement of law because, in his view, the instruction conveyed to the jury that it must find that he committed the September 3, 2009, home invasion because he committed the prior home invasion. The language of the jury instruction does not support Obregon's argument. The instruction stated explicitly that the jurors "may"—not "must"—use extrinsic evidence of the prior home invasion to help them decide whether Obregon was involved in the September 3, 2009, home invasion.[1]

Second, Obregon argues that the jury instruction was improper because it veered from the Fifth Circuit's pattern instruction on similar acts. The pattern instruction on similar acts, however, does not address identity, which was at issue in the instant case. Therefore, the district court did not abuse its discretion in veering from the pattern instruction to instruct jurors as to the "principles of law applicable to the factual issues confronting them." *Id.*

B.

1.

Vega's first claim on appeal challenges the sufficiency of the evidence in

---

[1] The jury instruction stated: "You heard testimony that Defendant Cesar Obregon-Reyes committed acts other than the ones charged in the superceding indictment. If you find that Defendant Cesar Obregon-Reyes did commit those other acts you may use this evidence to help you decide whether the similarity between the acts previously committed and the ones charged in this case suggest that the same person committed all of them. However, you may not consider this evidence for any other purpose."

No. 11-50653

support of each of his convictions. We review Vega's challenges *de novo* because he properly preserved them in the district court. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). Our review of the sufficiency of the evidence is "highly deferential to the verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002). "[V]iewing the evidence in the light most favorable to the prosecution," we consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Delgado*, 672 F.3d 320, 358 (5th Cir. 2012) (en banc) (quoting *Jackson*, 443 U.S. at 319). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999). However, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Delgado*, 672 F.3d at 362 (citations and internal quotations omitted). We "accept[ ] all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict," *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997), and resolve "any conflicts in the evidence . . . in favor of the verdict." *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990).

We first look to Vega's conviction for kidnapping in violation of 18 U.S.C. § 1201(a)(1). To establish this offense, the government must show: "(1) the transportation in interstate [or foreign] commerce, (2) of an unconsenting person who is, (3) held for ransom or reward or otherwise, (4) such acts being done knowingly and willfully." *United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010); § 1201(a)(1). Vega disputes only the fourth element.[2]

---

[2] Vega was also convicted of aiding and abeting, in violation of 18 U.S.C. § 2, with respect to the kidnapping. To prove the crime of aiding and abetting under 18 U.S.C. § 2, the government must show that: (1) the individual associated with the criminal venture, (2)

No. 11-50653

Vega primarily argues that the government cannot satisfy this fourth element because he was allegedly in custody at Dismas Charities halfway house on the day and time of Saucedo's kidnapping. The halfway house records indicate that Vega was present at the 3:00pm headcount on September 3, 2009. The government countered with evidence that the halfway house records contained numerous discrepancies, and that some employees had been fired previously for making false record entries. The government also proffered evidence showing that an employee of the halfway house forged the initials of another employee on the sheet for the 3:00pm headcount on the day that Saucedo was kidnapped. Moreover, several witnesses testified about the lax monitoring procedures at the halfway house and the different ways that residents could leave the halfway house and return without their absence being detected. A former resident testified that he had seen Vega leave the premises surreptitiously more than once. Resolving all credibility determinations and conflicts in the evidence in favor of the jury's verdict, we defer to the jury's apparent determination that the halfway house records were unreliable. *See Asibor*, 109 F.3d at 1030; *Duncan*, 919 F.2d at 990.

Viewing the record as a whole, we conclude that there is sufficient evidence from which a rational trier of fact could infer that Vega "knowingly and willfully" participated in Saucedo's kidnapping. "James Smith" ("Smith") testified that he had been friends with Saucedo since childhood and that both of them had worked in the drug business together. Both Smith and Saucedo's stepfather testified that immediately prior to his kidnapping, Saucedo received threats resulting from a dispute with members of the Sinaloa Cartel over a load of marijuana that law enforcement had seized, but the cartel members thought

---

purposefully participated in the crime, and (3) sought by his actions for it to succeed. *See United States v. Garcia*, 242 F.3d 593, 596 (5th Cir. 2001). On appeal, Vega does not dispute any of these elements.

9

he had stolen. Saucedo's stepfather further testified that he observed Saucedo speaking to Sinaloa Cartel members—once on the cell phone, and another time in person—at two separate barbecues before the kidnapping. On both occasions, Saucedo appeared nervous. A third witness, "Alan White" ("White"), testified that he overheard a conversation between two Saucedo Cartel members about whether Vega would carry out a "mission" for the cartel. Sometime after, White saw Vega driving a Jeep.

Further, the record contains testimony from several witnesses who heard Vega make incriminating statements about Saucedo's kidnapping. White testified to hearing Vega say "we picked him up," and that he was given "7,000, a Jeep, and some cocaine" by a Sinaloa Cartel member in charge of the Juarez territory, during a conversation in which Obregon was only a few feet away at a New Year's Eve party in 2009. White also testified that while riding with Vega in the car the following day, Vega said that he was not afraid to do anything to anyone and that he had already done it once. A fourth witness, "John Brown" ("Brown"), testified to overhearing Vega say that he had "busted a mission," "picked someone up," "went for him," and "took [him] out," at different party at Obregon's trailer in October or November 2009 that Vega attended. Brown further testified that Vega then pointed or motioned to Obregon and the third co-defendant Taylor, and said something to the effect of "Right, guys? We went for him." Vega disputes the credibility and accuracy of White and Brown's testimony, but we accept all credibility choices and resolve any conflicts in the evidence in favor of the jury's verdict. *Asibor*, 109 F.3d at 1030; *Duncan*, 919 F.2d at 990. Based on these incriminating statements, in combination with the evidence stated above, a rational trier of fact could have inferred that the government satisfied the fourth element of the kidnapping offense under § 1201(a)(1) beyond a reasonable doubt. Therefore, we conclude that the evidence was sufficient to support his conviction under § 1201(a)(1).

No. 11-50653

Next, we turn to Vega's conviction for conspiracy to kill, kidnap, or maim in a foreign country in violation of 18 U.S.C. § 956(a). To obtain a conviction for conspiracy to kill, kidnap, or maim in a foreign country, the government must prove: "(1) the defendant agreed with at least one person to commit murder [or to kidnap or maim another person]; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made." *United States v. Wharton*, 320 F.3d 526, 537–38 (5th Cir. 2003).

Vega claims that the evidence was insufficient to support his conviction for conspiracy to kill, kidnap, or maim in a foreign country on the grounds that the evidence does not show his agreement to kidnap Saucedo.[3] We disagree. There is ample evidence in the record from which a rational trier of fact could infer that Vega agreed to kidnap Saucedo. As detailed above, White and Brown testified that Vega made incriminating statements on separate occasions about Saucedo's kidnapping. Moreover, a witness who was familiar with the Sinaloa Cartel, Alvaro David Rosales ("Rosales"), testified that if a marijuana load had been stolen, as opposed to seized, then the life of the person responsible for it would be in danger. Smith testified that Saucedo was concerned that members of the Sinaloa Cartel had turned against him because they believed that he had stolen

---

[3] Vega also argues that the evidence was insufficient to support his conviction for conspiracy to kill, kidnap, or maim in a foreign country because the evidence does not show a conspiracy to commit murder. This argument is irrelevant because the government can satisfy the elements of conspiracy to kill, kidnap, or maim in a foreign country without evidence showing a conspiracy to commit murder—the plain terms of § 956(a) punish conspiracy to commit kidnapping. *See* 18 U.S.C. § 956(a)(1) (punishing conspiracy "to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States.").

the load of marijuana that he was responsible for, which was seized by law enforcement.  Saucedo's stepfather also testified that Saucedo told him that Sinaloa Cartel members were after him because of the seized marijuana load, and that Saucedo did not want to go to Juarez because he was afraid that cartel members would kill him.  Based on this testimony from several witnesses, we conclude that a rational trier of fact could infer that Vega conspired to kidnap Saucedo.  Therefore, the evidence was sufficient to support Vega's conviction for conspiracy to kill, kidnap, or maim in a foreign country.

We turn then to Vega's conviction for conspiracy to commit murder-for-hire in violation of 18 U.S.C. § 1958(a).  To obtain a conviction for murder-for-hire, the government must show: "(1) traveling or causing another to travel in interstate or foreign commerce . . . , (2) with intent that murder be committed . . . , (3) as consideration for the receipt of pecuniary value."  *United States v. Sharpe*, 193 F.3d 852, 863 n.6 (5th Cir. 1999); § 1958(a).  Moreover, to establish the conspiracy, the government must show: "'(1) an agreement by two or more persons to achieve the unlawful purpose of [interstate] murder-for-hire; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act committed by any one of the conspirators in furtherance of the conspiratorial object.'" *United States v. Blackthorne*, 378 F.3d 449, 453 (5th Cir. 2004) (quoting *United States v. Hernandez*, 141 F.3d 1042, 1053 (11th Cir. 1998)) (alteration in original).

Vega argues that the evidence is insufficient to support his conviction for conspiracy to commit murder-for-hire on the grounds that there was no evidence showing an agreement to commit murder.  We reject this argument.  Several witnesses testified to incriminating statements that Vega made on separate occasions.  In particular, Brown testified to hearing Vega say that he had "busted a mission," "picked someone up," "went for him," and "took [him] out." White also testified to overhearing Vega say that a Sinaloa Cartel member in

charge of the Juarez territory had given him "$7,000, a Jeep, and some cocaine." Moreover, Smith, White, and Saucedo's stepfather testified to Saucedo's involvement with the cartel, his conflict with its members over the seized marijuana load, and his fear that he would be killed because cartel members thought he had stolen it. Smith further testified that members of the cartel who were responsible for drug trafficking in Juarez were involved in Saucedo's specific drug trafficking operation. Saucedo's body was found in Juarez approximately five days after he was kidnapped. From these facts, we conclude that a rational trier of fact could infer Vega's agreement to commit murder. Accordingly, the evidence was sufficient to support his conviction for conspiracy to commit murder-for-hire.

Vega's last conviction was for interstate and foreign travel in aid of racketeering, and aiding and abetting, in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2. To obtain this conviction, the government was required to show: (1) Vega, or a person aided and abetted by Vega, traveled in foreign commerce or used a facility in interstate or foreign commerce, (2) with the intent to commit any crime of violence to further the unlawful activity of narcotics and controlled substance trafficking, and that (3) Vega, or a person aided and abetted by Vega, thereafter performed or attempted to perform a crime of violence. *See* § 1952;[4]

---

[4]  Title 18 U.S.C. § 1952 reads in pertinent part:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to –
>> (1) distribute the proceeds of any unlawful activity;
>> (2) commit any crime of violence to further an unlawful activity;
>> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform –
>>> (A)     an act described in paragraph (1) or

No. 11-50653

*United States v. Yamin*, 868 F.2d 130, 134 (5th Cir. 1989) (citing *United States v. Stovall*, 825 F.2d 817, 827 (5th Cir. 1987)) (affirming that to convict a defendant as an aider and abetter, the government must show that the defendant committed an act that contributed to the execution of the criminal activity and that he intended to aid in its commission).

Vega raises two meritless challenges to the sufficiency of the evidence in support of his conviction for interstate and foreign travel in aid of racketeering, and aiding and abetting.  First, he argues that there is insufficient evidence to show his involvement with Saucedo's kidnapping.  As we concluded above, a rational trier of fact could infer Vega's involvement with Saucedo's kidnapping based on the record.  Second, Vega contends that the Dismas Charities halfway house records show that he was present at the halfway house on the day and approximate time of Saucedo's kidnapping. The government, however, proffered evidence from which a rational trier of fact could infer that the records were unreliable.

Therefore, we conclude that the evidence was sufficient to support Vega's convictions for kidnapping; conspiracy to kill, kidnap, or maim in a foreign country; conspiracy to commit murder-for-hire; and interstate and foreign travel in aid of racketeering, and aiding and abetting.

2.

Vega's second claim on appeal challenges the district court's exclusion of statements made to him by his former attorney as hearsay.  We review the

(3)   shall   be   fined   under   this   title,
imprisonment  not  more  than  5  years,  or
both; or
(B)     an  act  described  in  paragraph  (2)
shall  be  fined  under  this  title,  imprisoned
for  not  more  than  20  years,  or  both,  and  if
death  results  shall  be  imprisoned  for  any
term of years or for life.

14

district court's evidentiary rulings for abuse of discretion. *United States v. De Leon*, 170 F.3d 494, 497 (5th Cir. 1999). If abuse of discretion occurred, then the exclusion of evidence is subject to harmless-error analysis. *United States v. Haese*, 162 F.3d 359, 364 (5th Cir. 1998). Under harmless-error review, reversal is not required unless there is a reasonable probability that the improperly excluded evidence contributed to the conviction. *See United States v. El-Mezain*, 664 F.3d 467, 526 (5th Cir. 2011); *United States v. Williams*, 957 F.2d 1238, 1242 (5th Cir. 1992).

Vega's former attorney would have testified that he had disclosed details of the offenses at issue to Vega based on information in the search warrant and the investigative reports. According to Vega, his former attorney's testimony rebuts the government's claim that Vega's knowledge of the offenses could only derive from his actual involvement. In support of its position, the government proffered a recorded conversation between Vega and Obregon in a police van that occurred after Vega's discussions with his former attorney. In the prison van, Vega discussed the evidence in the instant case with Obregon, instructed Obregon on how to coordinate their stories to law enforcement, and referenced specific members of the Sinaloa Cartel.

Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In offering his former attorney's testimony, Vega attempted to show his source of knowledge of the details of the offenses at issue. He did not offer the testimony to prove the truth of the matter asserted, namely the truth of the details of the offenses that his former attorney disclosed to him. Therefore, we agree with Vega that the district court improperly excluded his former attorney's testimony as hearsay. *See United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981) ("Using an out-of-court utterance as circumstantial

evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule."); *see also* 2 McCormick on Evidence § 249 (6th ed. 2006) ("A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as . . . having knowledge.").

Vega argues that this error was not harmless, alleging that his knowledge of the offenses was an important piece of evidence supporting his guilt for the offenses in the instant case. His knowledge of the offenses, however, was not the only evidence supporting his guilt. As detailed above, several witnesses testified to incriminating statements that Vega made about Saucedo's kidnapping. White testified to hearing Vega say "we picked him up," and that a Sinaloa Cartel member in charge of the Juarez territory gave him "7,000, a Jeep, and some cocaine," at a New Year's Eve Party in December 2009. White also testified that on the following day, Vega said that he was not afraid to do anything to anyone and that he had already done it once. Brown testified to overhearing Vega say at a different party in November 2009 that he had "busted a mission," "picked someone up," "went for him," and "took [him] out." Brown further testified that Vega then pointed or motioned to Obregon and the third co-defendant, Taylor, and said "Right, guys? We went for him."

Moreover, Smith testified that he and Saucedo had worked in the drug business together. Smith also testified that members of the Sinaloa Cartel who were responsible for drug trafficking in Juarez were involved in Saucedo's specific drug trafficking operation. Saucedo's body was found in Juarez approximately five days after he was kidnapped. Both Smith and Saucedo's stepfather testified that prior to his kidnapping, Saucedo received threats resulting from a dispute with members of the Sinaloa Cartel over a load of marijuana that law enforcement had seized, but that cartel members thought he

16

had stolen. Saucedo's stepfather further testified that he observed Saucedo speaking to Sinaloa Cartel members at two separate barbecues, and that Saucedo seemed nervous during and after both conversations. White also testified that he heard a conversation between two Saucedo Cartel members about whether Vega would carry out a mission. Sometime after the conversation, White saw Vega driving a Jeep.

We conclude that a rational trier of fact could have viewed the testimony of the several witnesses—many of whom testified to events that occurred before the alleged conversations between Vega and his former attorney—as credible to support the charges against him beyond a reasonable doubt. Therefore, the district court's exclusion of Vega's former attorney's testimony was harmless error in light of the other evidence presented at trial. *See United States v. Bell*, 367 F.3d 452, 468 (5th Cir. 2004) (noting that the appellate court "'must be convinced beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial'") (quoting *United States v. Vejar-Urias*, 165 F.3d 337, 340 (5th Cir. 1999)).

3.

Vega's last claim on appeal is that the district court's denial of his motion to excuse a juror for potential bias after the commencement of trial was error. After several witnesses had testified, the government advised the district court that Saucedo's mother knew one of the jurors. The government also notified the court that the juror was the neighbor of the Saucedo family for a brief time when Saucedo was one year old, and that since then, the juror had exchanged greetings with Saucedo's mother. The government further advised the court that it appeared that the juror recognized Saucedo's sister when the juror entered the courtroom, and might have had a conversation with her a few months before trial.

Soon after being advised of this information, the district court held a bench

conference in which the juror in question was brought before the court. Under questioning by the court, the juror stated that she knew the Saucedo family by face and by name, and denied ever being neighbors with the Saucedo family. When defense counsel asked the juror about her familiarity with Saucedo's sister, the juror, who was an employee of the Medicaid office, stated that she went through Saucedo's sister application for Medicaid a few months before trial. The district court asked the juror whether her familiarity with the Saucedo family would influence her ability to be fair and impartial, and the juror responded that it would not. At the conclusion of the bench conference, the district court stated that it would consider defense counsel's motion to remove the juror for bias, and ultimately denied the motion.

The district court "is afforded broad discretion in determining the impartiality of jurors; it is in the best position to observe their demeanor and credibility." *United States v. Graves*, 5 F.3d 1546, 1554 (5th Cir. 1993) (citing *United States v. Hinojosa*, 958, F.2d 624, 631 (5th Cir. 1992)). "Accordingly, a rule respecting such impartiality will not be set aside 'absent a *clear* abuse of discretion.'" *Id*. (quoting *Hinojosa*, 958 F.2d at 631). The record shows that the district court carefully considered the juror's potential bias after holding a bench conference in which both the government and defense counsel had ample opportunity to question the juror. Moreover, our precedent supports the district court's conclusion that the relationship between the juror and Saucedo's family was too attenuated to mandate the removal of the juror. *See*, *e.g.*, *Celestine v. Blackburn*, 750 F.2d 353, 358 (5th Cir. 1984) (affirming a trial judge's refusal to strike a juror for bias in a murder trial when the juror knew both the prosecuting attorney and was friends with the granddaughter of the murder victim). In light of these facts and our precedent, we cannot say that the district court's consideration and ultimate denial of Vega's motion to exclude the juror was a clear abuse of discretion.

No. 11-50653

III.

For the foregoing reasons, Obregon and Vega's convictions and sentences are AFFIRMED.